# Richmond.

## CRAIG-GILES IRON CO. V. WICKLINE AND OTHERS.

### November 20, 1919.

1. EJECTMENT—*Boundaries—Question for Jury.*—Where in an action of ejectment there was evidence tending materially to identify and locate plaintiff's grant in such way as to include the land claimed and held by the defendants under a junior grant, but this evidence was not conclusive; the court properly referred the question to the jury, and the verdict of the jury either way would have been binding upon the court.

2. BOUNDARIES—*Virginia and West Virginia Line—Crossing a Boundary.*—The line between the States of Virginia and West Virginia is, of course, well established, and when a boundary is described by metes and bounds, and is shown to be crossed by that line, it is a simple undertaking to determine where the line enters and where it leaves the boundary, even though neither point of intersection be given. It would only be necessary to run the outside lines of the boundary and then follow the State line through it.

3. EJECTMENT—*Burden of Proof.*—In an action of ejectment, the burden of proof is on the plaintiff to identify and locate the land which he claims, and to show that the same is included within his title papers.

4. ADVERSE POSSESSION—*Offer to Purchase Adverse Claim.*—An offer to purchase an adverse claim does not make the claim good.

5. ADVERSE POSSESSION—*Color of Title—Disseisin—Case at Bar.*—Where plaintiff held a 15,000-acre boundary under a senior grant, defendants' paper title under a junior grant to a tract within this boundary was valueless except as color of title. The plaintiff showed no actual possession, but it was under no obligation to do so. Its senior grant conferred upon it a constructive possession of the whole tract, and this constructive possession would continue good regardless of the junior grant, unless and until there was a disseisin.

6. ADVERSE POSSESSION—*Disseisin—Case at Bar.*—To constitute the disseisin referred to in the preceding syllabus, it was just as

necessary for the defendants to take actual possession of some part of the land as if they had entered without any color. In the one case, their possession of part would be possession of the whole, while in the other their possession would be limited to their actual occupancy; but in both cases it would be primarily essential that they should do some act indicating an actual possession of the land itself as distinguished from the mere taking of the products thereof.

7. ADVERSE POSSESSION—*Actual Possession—Question of Law and Fact.*—The question of what is actual possession, as well as the question of its continuity and notoriousness, are usually questions for the jury; but this is not true where there has been no act whatever indicating any taking of the possession of the land itself.

8. ADVERSE POSSESSION—*Actual Possession—Cutting Timber.*—The mere cutting and sale of timber at widely separated intervals upon mountain land in a state of nature by the holders of a junior grant does not operate as a disseisin and ouster of the owners under a senior grant, where what was done effected no substantial change in the condition of the property.

9. ADVERSE POSSESSION—*Actual Possession—Paying Taxes—Asserting Title.*—To sustain the defense of adverse possession the defendants, or those under whom they claim, must have entered upon the land in controversy and taken possession thereof by residence, improvement, cultivation, or other open, notorious, and habitual act of ownership. The acts of paying taxes, asserting title and forbidding trespassers, do not aid the claimant to adverse possession. The primary fact of actual possession must first be established. When this is done, proof of such additional acts is admissible, not as showing the possession itself but as showing its good faith, exclusiveness, notoriousness and hostility.

10. ADVERSE POSSESSION—*Wild and Uncultivated Land—Change in Condition Necessary.*—Wild and uncultivated lands cannot be made the subjects of adversary possession, while they remain completely in a state of nature. A change in their condition, to some extent, is therefore essential; and the acts by which it is effected are often the strongest evidence of actual possession. Without such change, accomplished or in progress, there can be no residence, cultivation, or improvement; no occupation, use, or enjoyment. Evidence short of this may prove an adversary claim, but, in the nature of things, cannot establish an adversary possession. Nor is there any reason for relaxing the rules of law on this subject, in behalf of the adversary claimant of such property. There ought to be no presumption

in his favor against the better title. It is vain for him to say that he has had all the possesssion of which the property was then susceptible; for that would lead to a constructive possession, which is only attributable to the rightful owner.

11. ADVERSE POSSESSION—*Seisin of Claimant—Acts Necessary.*—The character of the acts necessary to give to the party the seisin required must, of course, vary with the situation of the land and the condition of the country. In a settled and cultivated region an actual occupancy and pernancy of the profits may be requisite; whilst in the wilderness a possession less definite might suffice, if it appeared that the property was not susceptible of a stricter occupation; but it must always be an actual, visible, notorious, and continued possession.

12. ADVERSE POSSESSION—*Instructions.*—In an action of ejectment where the defense was adverse possession and the defendants failed to make out even a *prima facie* case of adverse possession, they were not entitled to any instructions on that subject.

13. APPEAL AND ERROR—*Reversal—Issue Erroneously Submitted to Jury.*—Where one of the principal issues submitted to the jury, and one upon which they might have based their verdict, was erroneously submitted, the judgment must be reversed on appeal, although the verdict might have been based upon another issue correctly submitted to the jury.

Error to a judgment of the Circuit Court of Alleghany county, in an action of ejectment. Judgment for defendant. Plaintiff assigns error.

*Reversed.*

The opinion states the case.

*M. P. Farrier, C. P. Jones, Jr.,* and *C. B. Cushing,* for the plaintiff in error.

*R. B. Stephenson* and *Geo. A. Revercomb,* for the defendants in error.

KELLY, J., delivered the opinion of the court.

This is an action of ejectment in which Craig-Giles Iron Company was plaintiff and W. A. Wickline and others were

29

defendants. There was a verdict and judgment for the defendants, and the plaintiff thereupon obtained this writ of error.

The plaintiff claims title under a grant issued in 1795 from the Commonwealth of Virginia to one Robert Young, for 15,000 acres. At the time of this grant the tract described therein was situate in the counties of Botetourt and Monroe in the State of Virginia, but owing to new State and county lines a portion thereof now lies in Monroe county, West Virginia, and the residue, involved in this litigation, in Alleghany county, Virginia. The defendants claim title under a grant issued in 1845 from the Commonwealth of Virginia to John Lewis for 279 acres in Alleghany county. The plaintiffs and defendants regularly connected themselves with the respective grants under which they claim. Both boundaries were composed entirely of wild mountain lands. At the time of the institution of this action in 1915, the defendants were in possession of the 279-acre tract, and if the plaintiff proved that the portion of its 15,000-acre survey lying in Virginia embraces the whole or any part of the 279 acres, it was entitled to a verdict, unless the defendants established a complete title by adverse possession. These two questions, first, whether the plaintiff by sufficient evidence identified and located its own boundary, and, second, whether the defendants have acquired title by adverse possession, are the two principal issues in the case as it comes to us for decision.

[1, 2] There was evidence tending materially to identify and locate that part of the 15,000-acre grant situate in Virginia in such way as to include the land claimed and held by the defendants, but this evidence was not conclusive, and the court properly referred the question to the jury. Its verdict either way thereon would have been binding upon the court. The defendants' contention that

neither the description in the declaration nor the proof of location on the ground was sufficient for this purpose, and that, therefore, the verdict was necessarily right regardless of any question of adverse possession, cannot be maintained. The declaration in describing the 15,000-acre boundary gives the entire outside lines by courses, distances and corners, and then concludes with this language: "The State line crosses this entire survey and intersects it at a point a short distance to the southwest of two pines which are named as a corner between the two lines S. 31 W. 80 poles and S. 40½ W. 100 poles. The land claimed by the plaintiff and intended to be covered by this declaration is the land in the above survey to the northeast of said State line." The defendants contend that this description is too indefinite to admit of a location on the ground for the reason that it only fixes one point of intersection by the State line and does not show the other point at which that line crosses the lines of the plaintiff's survey. The fallacy of this contention must be readily apparent. The line between the States of Virginia and West Virginia is, of course, well established, and when a boundary is described by metes and bounds, and is shown to be crossed by that line, it is a simple undertaking to determine where the line enters and where it leaves the boundary, even though neither point of intersection be given. It would only be necessary to run the outside lines of the boundary and then follow the State line through it.

It is very clearly established by the evidence, although defendants contend otherwise, that the portion of the 15,-000-acre survey which now lies in Virginia is within Alleghany county.

The only debatable question under the evidence is whether the lines of the 15,000-acre grant within the State of Virginia were so located as to include the whole or any part of the 279-acre tract. In this connection we may

advert to the very earnest contention of counsel for plaintiff that the plaintiff was not in any way concerned with the location of the 279-acre tract. This in a sense is true, but the evidence conclusively shows that the land which the defendants are now in possession of, and which the plaintiff is seeking to recover, is the 279-acre tract, and it necessarily follows that the plaintiff cannot recover any part thereof unless it shows that the same lies within the exterior boundaries of its grant.

Upon this branch of the case the trial court gave the following instruction: "The court instructs the jury that where a plaintiff in an action of ejectment claims, as in this case, that the land in controversy lies within the boundaries of the patent, and of the deeds under which he claims, that the burden is on the plaintiff to prove that the land in controversy is included within the outside boundaries of the patent and of the deeds under which it claims, and if the jury believe from the evidence that this burden has not been sustained by the plaintiff in this case, they must find a verdict for the defendants."

[3] The plaintiff complained of the foregoing instruction and assigned the giving of it as error. It is well settled law that the burden is on the plaintiff to identify and locate the land which it claims, and to show that the same is included within its title papers. See *Wood* v. *Phillips*, 117 Va. 878, 881, 86 S. E. 101, and cases cited. In view of the fact that the land claimed by the plaintiff and in possession of the defendants was the 279-acre tract, it is clear that there could have been no error in this instruction.

2. Coming now to the second question in the case, it will be necessary to state in some detail the evidence with reference to the adverse possession upon which the defendants are relying.

In 1853 John Lewis, the original patentee, went on the 279 acres for the purpose of making shingles and erected a small shanty for use while engaged in that work. He continued to make and sell shingles at intervals, "just once in a while," to such persons as he got orders from until about the beginning of the Civil War—a period of about seven years. He made no clearing on the land except "only around the shanty to keep the rattlesnakes off," and made a road for the purpose of getting the shingles out. In doing this work he sometimes employed four or five men to help him.

After the war Mrs. Lewis, the widow of John Lewis, who died in 1869, claimed the land as the devisee of her husband sold about 100,000 shingles therefrom to her sons, Henry C. and J. W. Lewis. The latter built a little house on the land and stayed there while making the shingles. He employed seven or eight men. The record does not disclose just how long this work was in progress, but it appears to have been all done at one time, and could not have covered more than a few months. This was in about the year 1871.

In 1880 Mrs. Lewis sold all of the white pine and shingle timber on the 279-acre tract to Withrow & Nettleton. This firm erected shanties and stables on the land, constructed cheap logging roads and cut and hauled away practically all the white pine. They were engaged in doing this from June to November (which according to the testimony of J. W. Lewis, was the longest period during which at any one time any part of the land was in the actual occupancy of anybody). During this period Withrow & Nettleton had a sawmill on the land, operating the same for a while at one place and later moving to another. They did no clearing except around the shanties and skids, and had no extensive lumber yards on the property, the

lumber being hauled away every day until the job was completed.

From 1880 until 1896 nothing further was done on the land, and the premises remained vacant. In the meantime Mrs. Lewis died, and in 1895 the land was sold in partition proceedings to her son, John W. Lewis, who in 1896 transferred his purchase to his son, J. E. Lewis. He put up a small house or shanty which he thought from what his father told him was on the land, but this proved afterwards to be a mistake, and he never had any house on the land. He put a small sawmill, sawmill-shed and small lumber yard thereon and conducted a small operation, peeling bark, getting out switch ties, white pine plank and whatever he could sell, but says in his testimony: "I didn't cut no great big amount; I cut all that I got bills for; it was very hard times." He kept his mill on the place for about three years, and his lumber yard remained there for about three years longer. He apparently moved his mills in about 1899, and finished and cleaned up his lumber yard in about 1902. He found no one on the land when he put his sawmill there, and he left nobody there when he moved away from the place.

From 1902, assuming that as the date on which J. E. Lewis cleaned up his lumber yard, to 1914, nothing further was done on the land, and in the meantime the premises again remained entirely vacant. In 1914 Lewis sold the land to W. A. Wickline, J. L. Wickline and A. P. Counts, the defendants in this action. They took possession of the land, but they found nobody there when they entered. There were no clearings and no evidence of clearings, except enough to indicate that there had been "saw mill sets" there, and even these places had grown up in saplings. There were no buildings whatever on the land, the shanties and sheds and stables referred to in the evidence having either rotted down or been removed.

There was also some general testimony to the effect that the various members of the Lewis family, down to and including J. E. Lewis, had kept other people off the land, but nothing very definite to this effect except that on one or two occasions old man Lewis refused to give permission to some parties who wished to go on the land and cut shingles. The only affirmative acts of ownership exercised on the land, until the defendants entered thereon in 1914 or 1915, were the cutting of timber therefrom at remote intervals.

It was also shown that the Lewises from the emanation of the patent down to the date of the sale to the defendants claimed to be the owners of this land, and that the land was generally reputed in the neighborhood to be owned by the Lewises; and, further, that the land from the date of the patent down to the date of the sale, had been assessed on the land books to the Lewises, and the taxes thereon paid by them.

[4] One other point in the evidence should be adverted to. One N. C. Posey testified that in about the year 1907, at the instance of Rumbarger & Company, at that time claiming to own the 15,000-acre tract, he took an option on this land from J. E. Lewis; but Posey was simply employed for the general purpose of taking options all through that section, and there was nothing to show that he took the option on this particular piece of land at the specific direction or even with the knowledge of the Rumbarger company. If he had done so, however, at the express direction of the holder of the senior title, his action would not have materially affected the case. An offer to purchase an adverse claim does not make the claim good.

We are of opinion that while the foregoing evidence makes out a case of continuous *claim* to the 279-acre tract on the part of the Lewises from 1845 to 1915, it is wholly insufficient to establish title thereto by *adverse possession.*

[5-7] In dealing with this branch of the case we must assume that the 279 acres, or some part thereof, lies within the 15,000-acre boundary owned under superior title by the plaintiff. The plaintiff held under a senior grant, and the defendants' paper title, therefore, is valueless except as color of title. The defendants upon a mere comparison of right and title with that of the plaintiff were not one bit better off than they would have been if they had held no paper title at all. If the plaintiff's lines covered any part of the land they were claiming, then they were claiming something which did not belong to them, and their junior title could only be helpful as color. The plaintiff showed no actual possession, but it was under no obligation to do so. Its senior grant conferred upon it a constructive possession of the whole tract, and this constructive possession would continue good regardless of the junior grant unless and until there was a disseisin. To constitute such disseisin it was just as necessary for the defendants to take actual possession of some part of the land as if they had entered without any color. In the one case, their possession of part would be possession of the whole, while in the other their possession would be limited to their actual occupancy, but in both cases it would be primarily essential that they should do some act indicating an actual possession of the land itself as distinguished from the mere taking of the products thereof. The question of what is such actual possession, as well as the question of its continuity and notoriousness, are usually questions for the jury, but this is not true where, as here, there has been no act whatever indicating any taking of the possession of the land itself.

[8] The Lewises had never done anything on this land except to cut and sell timber therefrom at widely separated intervals. The record in the partition suit, which was introduced by the defendants as a link in their chain of title,

shows that the land was sold for partition in lieu of a division in kind, on the ground that it was mountain land *in a state of nature*. What J. E. Lewis, the purchaser under that sale, subsequently did effected no substantial change in the condition of the property. This is manifest, not only from the evidence as to his small operations thereon, but especially from the wild and wholly unimproved condition in which the defendants found it in 1914.

[9] The additional acts of paying taxes, asserting title and forbidding trespasses do not aid a situation like this. The primary fact of actual possession must first be established. When this is done, proof of such additional acts is admissible, not as showing the possession itself, but as showing its good faith, exclusiveness, notoriousness and hostility.

These conclusions are abundantly supported by authority.

[10] In *Taylor* v. *Burnsides*, 1 Gratt. (42 Va.) 165, it was held that to sustain the defense of adverse possession the defendants, or those under whom they claim, must have entered upon the land in controversy and taken possession thereof by residence, improvement, cultivation or other open, notorious and habitual acts of ownership. Judge Baldwin, delivering the opinion in that case, said: "It follows from what has been said that wild and uncultivated lands cannot be made the subject of adversary possession while they remain completely in a state of nature. A change in their condition to some extent is therefore essential; and the acts by which it is effected are often the strongest evidence of actual possession. Without such change accomplished or in progress there can be no residence, cultivation or improvement; no use or enjoyment. Evidence short of this may prove an adversary claim; but in the nature of things cannot establish an adversary possession. Nor is there any reason for relaxing the rules of law on this subject in behalf of the adversary claimant

30

of such property. There is to be no presumption in his favor against the better title. It is vain for him to say that he has had all the possession of which the property was then susceptible; for that would lead to a constructive possession which is only attributable to the rightful owner."

Again, in the same case (1 Gratt. [42 Va.] p. 206), it is said: "Payment of taxes, prohibition of trespasses, surveys of the land, sales and conveyances of it, though they may serve to show a claim of title, are not evidence of actual possession."

In *Overton's Heirs* v. *Davisson,* 1 Gratt. (42 Va.) 211, 225 (42 Am. Dec. 544), Judge Baldwin again delivering the opinion of the court, reiterated the above doctrine and said: "The court is further of opinion that where land has been granted by the Commonwealth to different persons by conflicting patents, the junior patentee cannot under any circumstances disseize or oust the older patentee from or acquire an adversary possession of the land in controversy but by the actual occupation of some part thereof, or the use or enjoyment of some part thereof by acts of ownership equivalent to such actual occupation; and that while such patented lands remain completely in a state of nature, they are not susceptible of disseisin or ouster of, or adversary possession against, the older patentee unless by acts of ownership affecting a change in their condition."

In *Anderson* v. *Harvey's Heirs,* 10 Gratt. (51 Va.) 386, it was held that a temporary occupancy of the land in controversy for the purpose of cutting timber and converting the same into charcoal, though continuing for one or perhaps two years, could not operate as a disseisin and ouster of the holders of the better title.

In *Koiner* v. *Rankin,* 11 Gratt. (52 Va.) 420, it was held that while patented lands remain uncleared or in a state of nature, they are not susceptible of adversary possession

against the older patentee unless by acts of ownership effecting a change in their condition; and the·court in that case, speaking through Judge Lee and reaffirming the doctrine of *Taylor* v. *Burnsides* and *Overton* v. *Davisson, supra,* said: "The authority of these cases upon the points decided by the court has been, I believe, universally acquiesced in by the profession, and I deem it unnecessary to do more than simply to refer to them."

In *Turpin* v. *Saunders,* 32 Gratt. (73 Va.) 27, Judge Staples delivering the opinion of the court said: "This court has repeatedly held that wild and uncultivated lands cannot be the subject of adverse possession whilst they remain completely in a state of nature. A change in their condition to some extent is essential. Without such change accomplished or in progress there can be no occupation, use or enjoyment. Evidence short of this may prove an adversary claim, but in the nature of things cannot establish an adversary possession; nor is there any reason for relaxing the rules of law on this subject in behalf of the adversary claimant of such property. There ought to be no presumption in his favor against the better title. As has been well said, 'The inexorable operation of these statutes (of limitations), disregarding as they do entirely the original merits of the controversy, furnishes a sufficient reason for excluding mere presumption of the facts which they require and for exacting clear and decisive proofs of their existence.' "

In *Harman* v. *Ratliff,* 93 Va. 249, 24 S. E. 1023, Judge Cardwell, speaking for this court, reiterated the doctrine of *Taylor* v. *Burnsides, Overton* v. *Davisson,* and the other cases above cited, holding that to operate a disseisin of one having right, the entry should be made under a claim of title with the intention of taking possession, and be accompanied with such visible acts of ownership as from their nature indicate a notorious claim of property in the land.

In *Whealton* v. *Doughty*, 112 Va. 649, 72 S. E. 112, Judge Cardwell again reviews the authorities upon this question and sums up the result of them as follows: "All the authorities agree that acts done upon land requisite to constitute adverse possession must be such as to indicate and serve as notice of an intention to appropriate the land itself, and not the mere products of it, to the dominion and ownership of the party entering, being acts of permanent improvement."

In *Wilson* v. *Braden*, 56 W. Va. 372, 49 S. E. 409, 107 Am. St. Rep. 927, it was held that there can be no adverse possession of wild lands as against a superior title unless such possession is actual, exclusive, visible and notorious; that a mere claim to possession, accompanied by the occasional cutting of timber, the prevention of trespassers the payment of taxes, and the assertion of title, is not sufficient, but it must be such occupation, use, or holding of the property, or change in its character, as will make such claimant during such statutory period continuously subject to be treated as a trespasser by the holder of the superior title.

[11] The general doctrine on this subject is comprehensively stated by Professor Raleigh Minor in his admirable book on Real Property, as follows: "The character of the acts necessary to give to the party the seisin required must of course vary with the situation of the land and the condition of the country. In a settled and cultivated region an actual occupancy and pernancy of the profits may be requisite; whilst in the wilderness a possession less definite might suffice, if it appeared that the property was not susceptible of a stricter occupation; but it must always be an actual, visible, notorious and continued possession." 2 Min. Real Prop., sec. 1033.

[12] In the light of the foregoing authorities, we do not think that the defendants in this case have made out

even a *prima facie* case of adversary possession, and this being true they were not entitled to any instructions at all on the subject. It becomes unnecessary, therefore, to discuss in detail the instructions upon this aspect of the case.

[13] The instructions upon the question of the location of the senior patent by the plaintiff are correct, and if we could say from the record that the jury found for the plaintiff solely upon that issue, then the judgment of the lower court would be plainly right. It is clear, however, that one of the principal questions submitted to the jury, and the one upon which they may have based their verdict, was that of adverse possession, and we are of opinion that no verdict for the defendants upon that ground could have been sustained. It follows that the judgment must be reversed and the cause remanded for a new trial.

The remaining assignments of error are subordinate in any view of the case, and the conclusions already announced under them entirely negligible.

*Reversed.*