# 𝔖taunton

LAWRENCE L. MATTHEWS AND MARTIN MAX TERESCHANKO
v. W. T. FREEMAN COMPANY, INC.

September 6, 1950.

Record No. 3630.

Present, Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*Carlton E. Holladay*, for the appellants.

*Freeman & Cole*, for the appellee.

SPRATLEY, J., delivered the opinion of the court.

On March 3, 1947, W. T. Freeman Company, Inc., sometimes hereinafter referred to as the complainant or corporation, instituted this suit against Lawrence L. Matthews and

Frank M. Remorenko to establish its title to two lots of land in the town of Stony Creek, Sussex county, Virginia, and to remove a cloud cast upon the title by having cancelled a deed to the two lots, dated September 10, 1946, from B. O. Clements, unmarried, B. S. Clements and Blanche A. Clements, his wife, to Remorenko and Matthews. The bill alleged that the complainant had acquired title by adverse possession to the property by actual, exclusive, open, continuous, uninterrupted, hostile and notorious possession thereof for more than twenty years, accompanied by a *bona fide* claim of ownership; that it had erected on one of the lots a valuable warehouse, and had caused a railroad spur track to be placed thereon for its use in connection with its merchandising business; that prior to 1925, it had used a warehouse and spur track located on the second lot; that in 1925 the latter warehouse was destroyed by fire, and since that time it had used the said lots and spur tracks continuously for unloading coal and merchandise; and that subsequent to September 10, 1946, the defendants asserted title to the above lots and demanded possession thereof.

Remorenko and Matthews answered, denying generally the allegations of the bill of complaint. They averred that they relied upon the record title conveyed to them by the deed of September 10, 1946. They further set forth that Remorenko had conveyed his interest in the lots to Martin Max Tereschanko. Remorenko was thereupon dismissed as a party defendant, and Tereschanko was named in his stead.

Evidence was taken in the form of depositions and exhibits, and on consideration thereof the trial court entered a decree on April 25, 1949, holding that the complainant had not established a title by adverse possession to Lot No. 4, as shown on a plat filed in the proceedings as exhibit "A"; but that it had established a title by adverse possession to Lot No. 1 on said plat, during the lifetime of Dr. Bernard S. Clements but not thereafter.

On May 12, 1949, the court ordered that each party should bear its own costs.

The defendants assign error to so much of the decrees as held that complainant had established any title to Lot No. 1, and assessed any costs against them. They contend that the possession and use of Lot No. 1 by the complainant was permissive. . In addition, they argue that the failure of the complainant to list the lots for taxation and pay taxes on them barred its claim of adverse possession.

The corporation, on the other hand, assigns cross-error to the action of the trial court in refusing to hold that it had established a fee simple title by adverse possession to both lots, and in ordering it to pay a portion of the costs of the suit. It contends that the only possible permissive use of the land involved applies only to Lot No. 4.

A review of the history of the disputed property is required in order properly to get the facts in mind. Exhibit "A" is a plat made by a civil engineer in September, 1947, of a half-acre of land, almost a right-angled parallelogram in shape, subdivided into four lots. The half-acre is bounded on the north by Flat-Foot Road, on the east by the right of way of the main line of the Atlantic Coast Line Railroad Company, and on the south by lands of that railroad. Lot No. 1 lies in the northeast corner of the one-half acre tract. It is bounded on the north by Flat-Foot Road, upon which it fronts 70 feet; on the east by the right of way of the main line of the railroad company, upon which it fronts 36 feet; on the south by Lot No. 2; and on the west by Lot No. 3, which separates it and Lot No. 2, a distance of 40 feet from Lot No. 4. Lot No. 3 fronts on Flat-Foot Road 40 feet and runs back therefrom between parallel lines about 66 feet. Lot No. 4 is in the northwest corner of the tract, and fronts on Flat-Foot Road 300 feet. A railroad spur track runs diagonally across the eastern portion of Lot No. 4, and another spur track runs across the western portion of Lots Nos. 1 and 2 and the eastern portion of Lot No. 3.

The records in the Clerk's Office of the County of Sussex show that B. F. Winfield conveyed the one-half acre of land to William S. Overton in 1874. In 1883 Overton conveyed

to Eliza A. Dunnavant a part of the half-acre on the plat. This conveyance is shown as Lot No. 2. In 1887 Overton conveyed to Emma J. Magee another part identified on the plat as Lot No. 3.

In 1895, Alice Peebles Cobb, who later married Dr. Bernard S. Clements, was allotted what are now shown as Lots 1 and 4 on the plat, by a decree of partition in a chancery suit between the heirs of William S. Overton.

Mrs. Alice Peebles Cobb Clements died in West Virginia, in May, 1909, leaving surviving her husband, Dr. Bernard S. Clements, and a son, Bernard O. Clements, born three days before her death. By her last will and testament dated December 31, 1908, prior to the birth of her son, she devised the lots in dispute to her husband. The will was probated in July, 1909, in Mercer county, West Virginia, and an authenticated copy admitted to probate in the Clerk's Office of the County of Sussex, Virginia, on August 27, 1909.

At the time of the death of Mrs. Clements in 1909, the common law right of curtesy was in effect in Virginia. Consequently, the real estate in question, notwithstanding the provisions of her will, descended to her son, Bernard O. Clements, subject to the common law right of curtesy of her husband, Dr. Bernard S. Clements, therein.[*]

On September 10, 1946, Bernard O. Clements, Dr. Bernard S. Clements, and Blanche A. Clements, the latter's wife, conveyed the two lots in dispute to Frank M. Remorenko and Lawrence L. Matthews, by deed duly recorded in Sussex county on September 18, 1946. Remorenko conveyed his interest therein to Martin Max Tereschanko by deed dated February 26, 1947, duly recorded.

On September 19, 1946, Matthews and Remorenko notified W. T. Freeman Company, Inc., in writing, that they had purchased the disputed land with all improvements, and would like to have a conference concerning the removal or

---

[*]By section 5139A of the Code of Virginia, 1942 (Michie); Code of 1950, §§ 64-20 to 64-22, the law of curtesy as at common law has been modified in Virginia.

disposition of the warehouse on Lot No. 1. Again, on October 3, 1946, they gave the corporation a ten days notice to remove the warehouse from the property. Thereafter, in March, 1947, W. T. Freeman Company, Inc., instituted this proceeding.

Philip Freeman, secretary and treasurer of the corporation, a firm engaged in the general merchandise business, testified that for more than twenty years his corporation had been in the actual, exclusive, open, continuous, uninterrupted and notorious possession of both lots, and that its possession had been accompanied by a *bona fide* claim of fee simple ownership, hostile and opposed to the claims of all other persons. Four witnesses said they had observed the use and possession of the disputed premises by the corporation for its business purposes for many years, and thought it was the owner of the land.

Philip Freeman said that on January 3, 1917, his father, W. T. Freeman, the president of the corporation, came to the desk where he was employed as cashier of the corporation, and instructed him to issue a check to B. M. Hardy in the sum of $340 for the purchase of the property involved from Dr. Clements; that he wrote the check, gave it to Hardy, who told him that the deed would be forthcoming in a day or two; that Hardy said he needed the money as he had already paid Dr. Clements; and that not very long afterwards he, Philip Freeman, went into the Navy and did not know what happened about the deed. He thought that Hardy was the agent of Dr. Clements in the handling of the latter's real estate at Stony Creek. He did not know that there was such a person as B. O. Clements, the son of Dr. Clements, or that he had any interest in the land.

Freeman produced a ledger sheet of his corporation entitled "Real Estate," on which were numerous entries, in different colors of ink and in pencil, relating to land, personal property, and wages. One entry was as follows: "January 3, 1917, B. M. Hardy, $340," in green ink. Immediately

above the name of Hardy is the word "Warehouse," also in green ink. Freeman said that the word "Warehouse" was in the handwriting of his father, and the remainder of the entry in his own handwriting. There was another entry listing a charge for a warehouse under the general date of 1912. The lower portion of the ledger sheet contains a running account of a customer, debtor or creditor of the corporation.

No check or other voucher relating to the purchase of the disputed land could be produced and no deed or contract for its sale could be found. Freeman admitted that the disputed lots had never been listed or assessed for taxation in the name of his corporation. The corporation had been assessed for taxation on two buildings owned by it, but not on the land occupied by them, and Freeman thought that one of the buildings was the warehouse on Lot No. 1 and the other a smaller warehouse located elsewhere.

It appears that subsequent to 1917 the corporation erected a warehouse on Lot No. 4. After this building was destroyed by fire in 1925, the corporation erected the present warehouse on Lot No. 1. Lot No. 1 had been used previously for the storage of wire fence, staves, and other heavy articles in the open. A spur track on the western portion of Lot No. 1 and the eastern portion of Lots 2 and 3 was constructed by the corporation after 1917. Another spur track running across Lot No. 4 had been constructed many years prior to 1917. Both tracks were used for loading and unloading peanuts, cotton, fertilizer, coal and other commodities in carload lots.

Freeman admitted he knew that there had been some use of Lot No. 4 by various persons and, perhaps, some use of Lot No. 1; but he thought that the use by others was with the consent of his corporation.

Dr. B. S. Clements, a physician, and his son are and have been residents of West Virginia since 1909.

Dr. Clements made a visit to Stony Creek in 1910 or 1911, subsequent to the death of his wife, Mrs. Alice Peebles

Cobb Clements. On that occasion, accompanied by the late W. T. Freeman, president of W. T. Freeman Company, Inc., and B. M. Hardy, he walked from the railway station to his land near by. He mentions a little restaurant shack, "about 10 or 15 feet long and wide," located on Lot No. 1 along the right of way of the mainline of the railroad and the spur track on Lot No. 4. Hardy called his attention to the fact that there was also an open shed on a portion of his property which was being used by Freeman to load and unload fertilizer and peanuts. W. T. Freeman said that he had been using the property with the consent of the late Mrs. Clements and asked for permission to continue such use. Dr. Clements replied that he could keep it under the same conditions as long as he didn't need it, or didn't have to sell it, and there would not be any charge for its use. He testified that he "didn't aim for him to build a warehouse on there without rent," and did not know one had been built thereon until about four or five years prior to this suit.

There is no contradiction whatever that the above permission to use the property was then given. No one connected with the complainant ever thereafter got in touch with Dr. Clements or his son about this land until the institution of this suit.

Complainant contends that there is some confusion in the record over the location of the sheds or warehouses mentioned in the conference between W. T. Freeman and Dr. Clements in 1910 or 1911; as to which lot Dr. Clements referred to as in use by the complainant at that time; and also as to Dr. Clements' knowledge of the location of the lots in question. Neither Dr. Clements nor the witnesses for the complainant knew the exact lines and boundaries of the lots until the survey was made in 1947.

From the repeated references of Dr. Clements to the lot upon which the restaurant was located, Lot No. 1, and to the spur track existing in 1910, it is manifest that he was talking to W. T. Freeman about all of the property in

which he had an interest at Stony Creek. It may be readily inferred from the evidence that the corporation in 1910 or 1911, was using not only Lots Nos. 1 and 4, but also Lot No. 3, which divided Lots 1 and 4. Except for some small sheds or warehouses and the small restaurant, the disputed property was then open land, and upon it there were loaded and unloaded peanuts, fertilizer, and other commodities in carload lots, transported thereto or therefrom in wagons and trucks operated by various persons.

Dr. Clements hardly intended to give the corporation permission to use a part of the land, or one of the lots, and allow it to acquire title to the remaining land or other lot by adverse possession. The two lots were only 40 feet apart, not then platted, without visible boundary lines, and equally adaptable to the same character of use. The permissive tenant had ample opportunity to know the situation and understand the intention of the owner or owners, residents of a distant State.

Six or seven other witnesses, local residents, testified that the disputed property had been, for many years, used by numerous persons other than the complainant, for loading and unloading piling, cross ties and many cars of coal, without permission of any one so far as they knew.

There is no merit in the contention that B. M. Hardy was the agent of Dr. Clements for a sale of the land. Hardy was the railway station agent at Stony Creek, and was engaged in farming. At the request of Dr. Clements, Hardy, for four or five years, collected $10 a month rent from the tenant of the small restaurant located on a part of Lot No. 1, remitting $8 to Dr. Clements and retaining $2 for his services. Later, Hardy advised Dr. Clements that the town council of Stony Creek had condemned the restaurant property because of its dilapidated condition. Dr. Clements then wrote Hardy that he might tell the town to go ahead and tear the building down.

Dr. Clements testified positively that he had never authorized Hardy to sell the property in question or any

interest therein; that Hardy did not represent him in any capacity, save the collection of the rent mentioned above and as a messenger to the town council; that he had never received any money from Hardy or from any one for the purchase price of the disputed property; and that prior to the suit, he had never heard of the alleged sale to the complainant or notice that the complainant claimed title to the property.

Henry H. Cobb, a resident of Stony Creek, a half-brother of Mrs. Clements, and the owner of property adjacent to that of his half-sister, said that through error he and another sister or his father had paid the taxes on the disputed property until about 1934. At that time he directed the county treasurer to send the tax statements to Dr. Clements at Matoka, West Virginia. Dr. Clements thereafter paid the taxes.

■ The case turns upon a determination of the effect of the uncontradicted evidence that the complainant was first put in possession by agreement or promise of a predecessor in title of the defendants, and, that thereafter, the complainant made no disclaimer or disavowal of the title of the record owner or owners, or brought to them notice of the assertion of an adverse interest. Our conclusion, based on the facts and the applicable principles of law, is in favor of the defendants.

■■ The burden of proving all of the elements of adverse possession is on the party asserting title thereby. The evidence must be clear and satisfactory in order for him to prevail. All presumptions favor the holder of the legal title. Where the original entry on another's land was by agreement or permission, possession regardless of its duration presumptively continues as it began, in the absence of an explicit disclaimer. This presumption may, however, be overcome by evidence of adverse holding with notice to the true owner. 2 C. J. S., Adverse Possession, section 216d, page 823.

In *Neff* v. *Ryman*, 100 Va. 521, 523, 42 S. E. 314, this is said:

"It is settled law in this State that a tenant may dissever the relations existing between himself and his landlord without first surrendering possession of the leased premises, but in order for his possession to be deemed adverse, there must be a clear, positive and continued disclaimer and disavowal of the landlord's title, and knowledge of the fact that the possession is adverse must be brought home to the landlord before a foundation can be laid for the operation of the statute of limitations against him."

See also, *Creekmur* v. *Creekmur*, 75 Va. 430; *Thompson* v. *Camper*, 106 Va. 315, 55 S. E. 674; 1 M. J., Adverse Possession, section 14, page 232.

In *Hulvey* v. *Hulvey*, 92 Va. 182, 186, 23 S. E. 233, our court said:

"In questions of adverse possession a higher degree of proof is required in those cases in which the possession was begun in privity with the opposing claimant than in cases where no such relation existed. Where possession is originally taken and held in subserviency to, or in privity with, the title of the adverse claimant, a clear, positive, and continued disclaimer and disavowal of the title, and an assertion of an adverse right brought home to the adverse claimant, are indispensable before any foundation can be laid for the operation of the statute of limitations. If this were not so, the greatest injustice might be done. * * *

"In such cases the statute of limitations does not begin to run until the possession, before consistent with the title of the adverse claimant, becomes tortious and wrongful by the disloyal acts of the party in possession, which must be so open, notorious, and continued as will fully and clearly show the changed character of his possession, and knowledge of such change on the part of the adverse claimant."

See also, *Buchanan* v. *Norfolk So. R. Co.*, 150 Va. 17, 142 S. E. 405; *Duggins* v. *Woodson*, 117 Va. 299, 304, 84 S. E. 652.

■ While the question of the effect of evidence of payment or non-payment of taxes in suits relating to the establishment of title by adverse possession has not been heretofore considered by this court, it has been held in other States that such evidence is relevant in connection with other material factors.

In *Gadsden* v. *West Shore Inv. Co.*, 99 S. C. 172, 82 S. E. 1052, it is said that the payment of taxes is not evidence of title, but the failure to pay is evidence that no claim was made.

In *Christman* v. *Hilliard*, 167 N. C. 4, 82 S. E. 949, 951, it is held that, "The listing of the land and payment of taxes is a relevant fact, in connection with other circumstances, tending to show a claim of title and an adverse or hostile possession, though not sufficient by itself for the purpose."

In *State* v. *Low*, 46 W. Va. 451, 33 S. E. 271, the court said:

"The object of the government is to collect from everyone who claims title to land the taxes thereon, at a fair cash valuation. If claimants of hostile titles would protect the titles they claim, they must pay the taxes thereon."

■ W. T. Freeman and his son, Philip, were apparently substantial businessmen. They must have known the means and methods of obtaining title to real estate, and the necessity and propriety of paying taxes on property. They knew that the warehouse was assessed for taxation as a building separate and apart from the land it occupied, and that they had paid no tax on the land. Inferentially, this evidenced a lack of interest in the ownership of the land. The warehouse of the complainant on the disputed property was treated as its other warehouse on leased property, separate and apart from the ownership of the land it occupied. Non-payment of taxes under such circumstances is a negative act denying ownership of the property.

■ The trial court correctly held that in no event was the remainder estate of Bernard O. Clements affected by the possession of the complainant.

"The possession of the life tenant, or of those claiming under him or subject to his control, is not adverse to those entitled thereto in remainder or in reversion. This is because the right of action of the remainderman or reversioner does not accrue until the death of the tenant for life." 1 M. J., Adverse Possession, section 46.

In Volume Two, Minor on Real Property, 2d Ed., Ribble, page 1252, the reason is clearly stated as follows:

" * * * if one disseises a life tenant and occupies the premises for the statutory period he acquires title as against the life tenant but not as against the remainderman or reversioner. This is true whether the remainder is vested or contingent. The same principle would apply, of course, to the interest of one having any future limitation upon disseisin of the person in possession. It would likewise apply to the dower right of a widow, in case of adverse possession against the husband during coverture. In all of these cases the one entitled to the future interest or possibility, having no right to possession, has no right to eject the adverse possessor. Hence the limitation does not run until that right is acquired."

What we have said covers all of the assignments of error and cross-error, except the question as to payment of the costs of this proceeding.

For the reasons stated, we are of opinion that the trial court erred in holding that the complainant had established title by adverse possession to any of the property involved. Consequently, defendants were entitled to recover their costs in the trial court.

The corporation justly complains that appellants' brief contains no concise statement of facts, and that the printed record has been unnecessarily encumbered by the inclusion of duplicates of original exhibits, numerous notary certificates, captions on papers, and other exhibits not material. Ten printed pages are employed in a repetitious statement of facts, without completely accurate references to the record. Five pages should have sufficed. (Rules of Court,

Part 5:12, section 1(c), formerly Rule 14; section 1 (c).) Duplication of original exhibits and unnecessary writing and documents occupy about twenty-four printed pages.

The party substantially prevailing in this court is entitled to recover his costs, Virginia Code, 1942 (Michie), section 3528; Code of Virginia, 1950, section 14-178; but it is the duty of litigants not to unnecessarily increase the costs. If any paper, document, or writing be unnecessarily copied in the record, the court may, in its discretion, direct the costs of said printing to be paid by the party at whose instance it was done. Virginia Code, 1942 (Michie), section 6344; Code of Virginia, 1950, section 8-472.

Virginia Code, 1942 (Michie), section 6357; Code of Virginia, 1950, section 8-481, which provides that original exhibits, instead of being copied in the record, may be used at the hearing on appeal with the same effect as in the court below, is to avoid the expense of making copies and to facilitate appeals. We have repeatedly denounced a non-compliance with the rules of this court (*Hall* v. *Hall*, 181 Va. 67, 70, 23 S. E. (2d) 810); and the practice of unnecessary printing (*Hendry* v. *Hendry*, 172 Va. 368, 371, 1 S. E. (2d) 340), and announced our intention to vitalize the requirements of the rules and the provisions of the statute. See also, *McCready* v. *Lyon*, 167 Va. 103, 112, 187 S. E. 442, 446.

Accordingly, it is adjudged, ordered and directed that the bill of the complainant be dismissed at its costs, save and except the costs of printing the twenty-four pages of the record, which are to be charged to the appellants, Matthews and Tereschanko.

*Decrees reversed in part and bill dismissed.*