HENRY W. CALHOUN, ET AL.

v.

THEODORE KENNEDY WOODS, JR., ET AL.

Record No. 921158

June 11, 1993

Present: All the Justices

*Ralph E. Main, Jr.* for appellants.

*Edward R. Slaughter, Jr. (Slaughter & Redinger*, on brief), for appellee Theodore Kennedy Woods, Jr.

No brief or argument for appellees Anne E. Woods; Martha Woods Churn; Margaret Woods Gillette; Anne Woods Guzzardi; Dorothy Woods McLeod; Grace Douglas Woods Sprunt; Montgomery Bird Woods; William Sharpless Derrick Woods, Jr.; and Lucretia Woods Wyckoff.

JUSTICE COMPTON delivered the opinion of the Court.

This is an appeal in a suit to quiet title to certain parcels of unimproved mountain land. The claimants seek to acquire title by adverse possession. The dispositive issue on appeal is whether the trial court correctly ruled that the claimants failed to establish their title by the requisite burden of proof.

In 1988, claimants Henry W. Calhoun and Katharine J. Calhoun, his wife, filed a bill of complaint against Theodore Kennedy Woods, Jr. and others, asserting title to three parcels of land in Albemarle County. The claimants are the owners of property adjacent to the land in issue. The claimants allege that they, and their predecessors in title, "have always thought their property to

include'' the parcels in dispute in this litigation. The claimants acknowledge in their bill that the disputed parcels are owned of record by the defendants. The claimants assert that they have acquired title to the defendants' property by adverse possession and ask their title to "be established, confirmed and quieted." Woods, the only defendant appearing in the suit, filed an answer denying that the claimants are entitled to the relief requested.

Subsequently, the trial court referred the cause to a commissioner in chancery. The commissioner conducted three hearings, heard the testimony of 15 witnesses, received in evidence 36 exhibits, and viewed the premises. The commissioner filed a report and, upon recommittal, a supplemental report finding the claimants to be owners of the property. Woods filed exceptions.

Upon consideration of the transcripts of the commissioner's hearings, the exhibits, the commissioner's reports, and argument on the exceptions, the chancellor, who did not view the property, overruled some exceptions but sustained others; the sustained exceptions generate the dispositive appellate issue.

We awarded the claimants this appeal from the April 1992 final decree ordering that title to the disputed property be "forever quieted and confirmed" in the defendants against any claim of the Calhouns or any other person. We also awarded the appeal upon assignments of cross-error; because of the view we take of the case, however, we will not address those further.

■ Initially, settled principles of law that are pertinent to this appeal should be reviewed. As indicated, the focus will be on only those portions of the commissioner's ruling rejected by the trial court. When a chancellor has disapproved findings of the commissioner, the appellate court must review the evidence on the subject and ascertain whether, under a correct application of the law, the record supports the findings of the commissioner or the conclusions of the trial court. *First Nat'l Bank* v. *Cobler*, 215 Va. 852, 854, 213 S.E.2d 800, 802 (1975).

■ "To establish title to real property by adverse possession, a claimant must prove actual, hostile, exclusive, visible, and continuous possession, under a claim of right, for the statutory period of 15 years." *Grappo* v. *Blanks*, 241 Va. 58, 61, 400 S.E.2d 168, 170-71 (1991). *See* Code § 8.01-236. The burden is upon the claimant to prove all the foregoing elements by clear and convincing evidence. *Grappo*, 241 Va. at 62, 400 S.E.2d at 171; *Matthews* v. *W.T. Freeman Co.*, 191 Va. 385, 395, 60 S.E.2d 909, 914 (1950).

Proof of *actual* possession may be by use and occupation of the property; a person is in *hostile* possession if the possession is under a claim of right and adverse to the right of the true owner; and possession is *exclusive* when it is not in common with others. *Grappo*, 241 Va. at 62, 400 S.E.2d at 171. Possession is *visible* when the use is so obvious that the true owner is presumed to know of it. *Turpin* v. *Saunders*, 73 Va. (32 Gratt.) 27, 34 (1879). "Possession is *continuous* only if it exists without interruption for the statutory period." *Grappo*, 241 Va. at 62, 400 S.E.2d at 171.

■ A *claim of right*, in the context of adverse possession, means a possessor's intention to appropriate and use the property as the possessor's own to the exclusion of all others. A claimant's actual occupation, use, and improvement of the land, as if the claimant were in fact the owner, is conduct that can prove a claim of right. *Id.*

■ All presumptions, however, favor the holder of the legal title. *Matthews*, 191 Va. at 395, 60 S.E.2d at 914. And, wild and uncultivated land cannot be made the subject of adverse possession while it remains completely in a state of nature; a change in its condition to some extent is essential. *Craig-Giles Iron Co.* v. *Wickline*, 126 Va. 223, 233, 101 S.E. 225, 229 (1919).

The land in question is located on Appleberry Mountain, in the eastern foothills of the Blue Ridge Mountains, about 20 miles southwest of Charlottesville. According to the record, the 1,880-foot mountain is named for William Appleberry, an Englishman who acquired in 1735 a grant of 5,000 acres in the area. He offered 25 acres to any Hessian who would build a home on the land.

During the Civil War, a descendant of Appleberry and a group of Hessians mined lead there for use by the Confederate Army. After the turn of the present century, an orchard industry developed in the area and the Albemarle Pippin apple grown there became popular. This industry declined during World War II because of labor and gasoline shortages, and because of modern packaging methods developed in the orchards of the western states. According to the record, descendants of the original Hessians continue to reside in the area.

The disputed land lies among six adjoining parcels in a natural "bowl." It was described as an "immature forest" that had grown after being "heavily cut over at some point" early in the present century. The six parcels comprise generally a parallelogram with the longer portion lying in a north-south direction. The disputed parcels,

designated 1, X, and 4, are positioned in the northwest, northeast, and southeast quadrants, respectively, of the figure. The quantity of land in dispute totals approximately 145.5 acres. The remaining parcels in the parallelogram, positioned in the center section and southwest quadrant, are owned by the claimants.

■ The claimants sought to establish that their period of adverse possession began in 1931 when Philip M. Jones, Mrs. Calhoun's father, acquired title to some of the parcels adjoining the disputed parcels. The claimants assert that adverse possession continued until the institution of this proceeding. They acquired title to their property in 1966 from Jones and his wife, and seek to tack their possession onto the Jones possessory period. The claimants sought to prove that the use and possession of the disputed property included the following activities: sawmill operations, logging, firewood gathering, construction and maintenance of gates, construction and use of buildings, installation and use of water and electricity, hunting, property posting, erection and maintenance of fencing, husbandry, orchardry, recreational activities, conservation activities, occupation and leasing, and construction and maintenance of roads.

The chancellor, after a thorough review of the evidence in a letter opinion, concluded that ''the combination of the rigorous standard for proving adverse possession, the presumption in favor of the holder of legal title, and the applicable case law indicate that the Calhouns have not sufficiently established that they continuously possessed Parcel No. 1, No. 4 and No. X.'' We agree with the chancellor.

■ A detailed recitation of the evidence offered to prove the claimants' case is unnecessary. It is sufficient to state that when Jones acquired the undisputed parcels from 1931 to 1939, he mistakenly believed that he obtained title to the disputed land. Consequently, Jones, and later the claimants, engaged in activities both on their land and on the defendants' land. But the evidence is unclear where many of these activities took place and whether the acts were connected with use of the disputed or undisputed parcels. Moreover, many of the uses of the disputed parcels during the period in question were intermittent and sporadic. A few examples will illustrate the overall insufficiency of the claimants' case.

Jones built narrow roads through the disputed parcels beginning in 1933. Later, Calhoun maintained those roads. But it can be inferred from the record that the purpose of the construction and

maintenance of the several ways was to provide access to the undisputed parcels, as opposed to the disputed land.

Jones permitted one Fitzgerald to conduct a sawmill operation in 1949 or 1950 on Parcel No. 1. The sawyer built a small, frame "shanty" as well as two other frame structures on that parcel for use of his workers. But the sawmill operated for only two years, after which the mill and cabins were abandoned. Apparently, a college professor lived alone in one of the cabins that had electrical service for four summers during the early 1950s with Jones' permission.

The claimants offered evidence that the Jones family spent "every summer, all summer" on Appleberry Mountain from 1933 until 1952, and that both the Joneses and the Calhouns made regular trips there in later years. But the record does not reveal whether they stayed on the disputed or undisputed property.

The claimants submitted evidence that they allowed friends to use the property in the bowl for recreational purposes such as hiking and hunting. But the record is unclear precisely to what extent and during what period of time the disputed property actually was used. Also, evidence that the entire bowl was posted by the claimants against hunting and trespassing was imprecise as it related to posting of the disputed land.

Finally, even though there was abundant evidence of some use of the disputed property during the period in question, the evidence was in sharp conflict whether the use was sufficient to change its natural condition so as to notify the defendants of any hostile claim. Woods, a retired naval officer and attorney living in Arlington, learned in 1986 that the claimants "were laying claim to certain of our property up in Appleberry by . . . adverse possession." Woods had visited the property, which had been in his family since 1900, for the first time in 1984.

A consulting forester, testifying for the defendants, had made a timber examination of the Appleberry area at the request of the Woods family in 1975 when he was the Albemarle County Forester with the Virginia Division of Forestry. At the time, he found no "disturbance" on the disputed parcels or anything to indicate "control by a third party."

█ Accordingly, we hold that the record supports the conclusions of the trial court. Our study of the testimony and the exhibits convinces us that the claimants' case is insufficient to establish claimants' title by evidence that is clear and convincing.

Therefore, the final decree in favor of the defendants will be

*Affirmed.*