# CIRCUIT COURT OF HENRY COUNTY

Peter Robinson

v.

Margaret Katherine Washburn
and Martha Lea Washburn

April 15, 2010

Case No. CL06-602

BY JUDGE G. CARTER GREER

On December 27, 2006, the plaintiff filed his complaint, seeking (1) a declaratory judgment to establish a boundary line; (2) a declaratory judgment to establish an express easement; (3) a declaratory judgment to establish an implied easement; (4) an injunction requiring the defendants to remove fences and gates; and (5) damages arising from the defendants' alleged trespass on plaintiff's land. The defendants filed an answer denying the allegations of the complaint and a counterclaim, seeking a declaration that the plaintiff's right to use a thirty-foot road across defendants' property has been abandoned; an injunction to prevent the plaintiff from using the road in question; and monetary damages for intentional infliction of emotional distress. By order entered on May 9, 2007, this court sustained the plaintiff's demurrer as to the cause of action for intentional infliction of emotional distress and granted leave to the defendants to file an amended counterclaim. The defendants then filed an amended counterclaim and, with additional leave of court, a second

amended counterclaim as to which the parties are at issue. The second amended counterclaim asserts five claims: (1) that the defendants have acquired a portion of the thirty-foot road through reformation of a deed, implied grant, or, alternatively, adverse possession; (2) that the thirty-foot road has been extinguished by operation of law; (3) that the thirty-foot road has been abandoned; (4) that the defendants have acquired title to an area west of the centerline of Little Marrowbone Creek through reformation of a deed, implied grant, or, alternatively, adverse possession;[1] and (5) that the defendants have acquired an easement concerning an area west of the creek through reformation of a deed, implied grant, or alternatively, prescription. The defendants have also filed a motion to strike the plaintiff's claim for damages. Although the plaintiff filed two motions for partial summary judgment, there has been no adjudication of those motions because neither party sought a hearing.

On December 14, 2009, the court conducted an evidentiary hearing, during which the parties presented the testimony of numerous witnesses and offered nineteen exhibits, consisting of deeds, plats, photographs, and depositions. The parties have submitted lengthy post-trial memoranda, which the court has considered, and the matter is now ripe for decision.

The evidence reveals that the parties trace the titles to their respective parcels of land to a common grantor. By deed dated August 26, 1939, and recorded in the Clerk's Office of the Circuit Court of Henry County in Deed Book 64 at page 492, C. Q. Perdue conveyed unto J. E. Washburn tracts A, B, C, and D, containing in the aggregate 62.5 acres according to a plat of survey made by Thomas S. Moore, C.L.S., and recorded in Map Book 2 at page 101 ("ABCD Plat".) The ABCD plat shows that Little Marrowbone Creek, a non-navigable waterway, runs through tracts A and B in a northwesterly direction and forms the boundary line of tract D. The ABCD plat also designates a thirty-foot "Road Space" ("thirty-foot road"), which delineates the northeast boundary line of tract A and the northern boundary line of tract B. By deed dated October 12, 1963, and recorded in the Clerk's Office in Deed Book 184 at page 58, J. E. Washburn and his wife conveyed unto S. L. Goodman tracts A, B, C, and D, less a strip of land west of the creek reserved to the grantors. The metes and bounds description of this parcel states that the

---

[1] The defendants do not seek title through adverse possession to the entire pasture or floodplain area west of the creek but only to that portion of the pasture abutting the watering area.

boundary line runs "up Little Marrowbone Creek 1300 feet, more or less." After successive conveyances to a number of predecessors in title, the plaintiff acquired from Paul Goad/Warren Radford, L.L.C., what had been tracts A and B, less the strip of land west of the creek, by deed dated May 10, 2004, and recorded in the Clerk's Office as Instrument No. 040003471. This deed renamed tracts A and B as tracts 152A and 152B, according to a plat of survey made by Terry A. Waller, L.L.S., dated March 18, 2004, and recorded contemporaneously with the deed ("Waller Plat"). Significantly, the deed contains the following language:

> included in this conveyance is a non-exclusive perpetual right of way easement over and across the 50-foot road space leading off state route 641 (Joseph Martin Highway), and a 30-foot road space leaving off the 50-foot road space, both which road spaces lead to and through the property hereby conveyed, as shown on said map.

The Waller plat shows the thirty-foot road in the same location as it is depicted on the ABCD plat. In addition, the Waller plat identifies a fifty-foot easement traversing tracts 152A and 152B for ingress and egress to and from the subject parcels as well as other parcels depicted on the plat.

By deed dated June 23, 1941, and recorded in the Clerk's Office in Deed Book 69 at page 205, the heirs at law of D. H. Pannill conveyed unto J. E. Washburn tract 39 as shown on plat of survey made by T. S. Moore, dated April 27, 1937, and recorded in the Clerk's Office in Map Book 2, page 99 ("Tract 39 Plat"). The Tract 39 plat demonstrates that the thirty-foot road delineates the southernmost boundary line of tract 39. By deed dated December 13, 1939, and recorded in the Clerk's Office in Deed Book 65 at page 245, D. H. Pannill and Greyson L. Pannill, husband and wife, conveyed unto J. E. Washburn lots one through seven, according to the Tract 39 plat. Following a series of conveyances to predecessors in title, by deed dated July 21, 1993, and recorded in the Clerk's Office in Deed Book 615 at page 308, the defendants acquired from M. A. Washburn tract 39 and the strip of land west of the creek, less that portion of the property conveyed to the Commonwealth of Virginia by deed dated May 15, 1974, and recorded in the Clerk's Office in Deed Book 251, page 380. By deed dated February 28, 1982 and recorded in the Clerk's Office in Deed Book 345 at page 256, the defendants acquired from M. A. Washburn and Margaret L. Washburn, husband and wife, lots one through seven and a 0.403 acre tract as shown on a plat of survey made by W. C.

Brown, C.L.S., dated April 26, 1972, and recorded in the Clerk's Office in Map Book 52 at page 25.

The remote grantor of the parties, J. E. Washburn, was the defendants' grandfather, who purchased property on both sides of the creek primarily for timber. (Tr. at 145.) When they were young, the defendants, who are sisters, visited their grandfather "every Sunday ... [and] probably three or four times every week." (Tr. at 151.) In 1970, the defendants and their parents moved into a trailer that M. A. Washburn, the defendants' father, had placed on the premises. (Tr. at 150.) A few years after moving into the trailer, the defendants' father purchased a house that was located in the right-of-way belonging to the Commonwealth of Virginia, and he hired a North Carolina firm to move the house to its present location on tract 39. (Tr. at 156.) The defendants Margaret Katherine Washburn ("Margaret") and Martha Lea Washburn live in that house today. (Tr. at 157.)

Until the defendants moved to the property, the thirty-foot road "was just a path." (Tr. at 151.) The defendants' grandfather and father raised cattle that used the path, and the defendants as young girls walked on the path to get to a pond. Before 1970, there were at least three gates on the thirty-foot road: one at the intersection with the hard surface road, one at the curve, and another at the hay barn. (Tr. at 154.) Over the years, the defendants' father spread gravel over the thirty-foot road, which eventually became the defendants' driveway. (Tr. at 157.) There has never been any development of a road beyond the end of the defendants' driveway (Tr. at 157), nor has the thirty-foot road ever crossed the creek in Margaret's lifetime. (Tr. at 158.)

Throughout Margaret's lifetime, there have been fences along the western boundary of the creek, and the defendants' grandfather and father maintained those fences. (Tr. at 170-71.) With the permission of James A. Hopkins, who owned bottom land ("pasture" or "floodplain area") across the creek, the defendants' father put an electric fence around the pasture and connected it to a barbed wire and woven wire fence at the creek. (Tr. at 171.) Directly behind Margaret's barn, there is a watering area at the creek that has been in existence since 1939 for the use of cattle and horses. (Tr. at 174.) When Margaret was a small child, the defendants' father maintained the watering area with a backhoe. (Tr. at 173.) At that time, the defendants' father made a crude gate with poles and placed it at the watering area in order to prevent his horses from going across the creek into the pasture. When the defendants' father opened the gate, the horses could go freely back and forth between tract 39 and the pasture, where the

horses could graze. (Tr. at 174-75.) In later years, the defendants attached the barbed wire fence to a movable T-post, which they could close when they did not want the horses to go across the creek. (Tr. at 171.) When James F. Wheeler, Jr., bought tracts A, B, C, and D in 1999, he told Margaret to "leave the fences the way they were and keep grazing [the horses]." (Tr. at 178.) Warren Radford, whose limited liability company bought tracts A, B, C, and D in 2003, told Margaret Katherine that she could "go ahead and keep grazing" her animals and that, when he was ready to sell the property, she could "move that fence back to the creek." (Tr. at 179.) The watering area was fenced on the west side of the creek from 1963 to 2004. (Tr. at 205.) The fence was continuous, except that there was a gate at the watering area. (Tr. at 296.) In their depositions, both defendants testified that the watering area was not fenced, but they attribute these prior inconsistent statements to not understanding the examiner's question.

The plaintiff purchased tracts 152A and 152B at public auction, though he did not actually attend the auction in person. Cynthia Robinson ("Cynthia"), the plaintiff's wife, attended the auction in the plaintiff's behalf. (Tr. at 92.) On the day of the auction, Cynthia and Jerry Handy, who rented from Cynthia at that time, rode over the property in a four-wheeler driven by Johnny Lambert, a realtor. (Tr. at 93.) Neither Cynthia nor Handy saw any fencing along the creek. (Tr. at 94; Handy Dep. at 9, 10.) At the auction, Margaret asked Cynthia if she (Margaret) could buy the floodplain area. (Tr. at 95.) She told Cynthia that the property had no value, and "that it just flooded out real bad whenever it rained." (Handy Dep. at 10.) At some point after the auction, Cynthia told Margaret that she "would let her use [the floodplain area] until Peter came to fence." The plaintiff, who was from Australia, did not return to Virginia until approximately a year after the auction (Tr. at 96), during which time, the defendants continued to use the floodplain area. (Tr. at 102.)

In May 2005, the defendants erected a fence on the east side of the creek, but the fence crossed the creek at the watering area, ran along the west side of the creek for a distance of one hundred ten feet, and then crossed the creek again and continued on the east side of the creek. (Tr. at 40, 50.) This action blocked access to the watering area for the plaintiff's horses. (Tr. at 40.) In the plaintiff's view, it was "impractical" to develop a watering area at another location along his side of the creek because of the steepness of the bank and environmental issues. (Tr. at 73.) When the plaintiff asked Margaret to remove the fence from the watering area, she refused and stated that he had almost 1200 feet of creek on which to water

his animals. (Tr. at 41, 204.) Since he considered the defendants' fence unsafe, the plaintiff erected a fence that started on his side of the watering area and continued down the center of the creek. (Tr. at 74.) When the defendants' blind horse got entangled in the plaintiff's fence, Margaret removed that portion of the fence that was in the creek without obtaining the plaintiff's permission. (Tr. at 226-28.)

When the plaintiff purchased tracts 152A and 152B, he thought that he was getting a right of access to his property by means of the thirty-foot road. (Tr. at 61.) Plaintiff admits that he has access to his property across the fifty-foot road as shown on the Waller plat. (Tr. at 62.) From the plaintiff's perspective, "it appeared at some stage in the past that [the thirty-foot road] had been used to cross Marrow Bone Creek," and that the area between the defendants' house and the creek had been developed as a road. (Tr. at 66.) When Cynthia rode over the property on the day of the auction, the thirty-foot road "was just a grown-over path." (Tr. at 126.)

There are two main issues in this case: (1) whether the plaintiff has a right to use the thirty-foot road for ingress to and egress from his property and (2) whether the defendants have obtained title to a strip of land on the west side of the creek at the watering area through adverse possession. In the court's analysis of this case, the issue of adverse possession encompasses the issue of a prescriptive easement. As to the second issue, it is important to note that the defendants "concede that the centerline of the creek is the legal boundary between the properties, except in the Watering Area." (Defendants' Mem. at 8.) The defendants do not claim any right to use the entire floodplain area and are, instead, asserting a claim only to that strip of land on the west side of the creek at the watering area for a distance of one hundred ten feet. (Tr. at 203.)

*1. Does the plaintiff have a right to use the thirty-foot road for ingress to and egress from his property?*

Citing *Lindsay v. James*, 188 Va. 646, 51 S.E.2d 326 (1949), and *Ryder v. Petrea*, 243 Va. 421, 416 S.E.2d 686 (1992), the plaintiff argues that, when the common grantor, J. E. Washburn, subdivided his property in accordance with the ABCD plat and the Tract 39 plat, he conveyed to the plaintiff's predecessor in title an express easement "to traverse the designated road spaces contained on those plats which include the 30 foot road space which goes across the property currently owned by [the defendants]." (Plaintiff's Mem. at 18.) Relying upon *Read v. Jones*, 152 Va. 226, 146 S.E. 263 (1929), the defendants contend that, since the

common grantor owned all of the subject property, Tracts A, B, C, and D, Tract 39, and Lots 1 through 7, seisin in the dominant and servient estates became united in the same person and the easement along the thirty-foot road was extinguished by operation of law. (Defendants' Mem. at 13, 14.) Furthermore, citing *Hudson v. Pillow*, 262 Va. 296, 541 S.E.2d 556 (2001), and *Lindsey v. Clark*, 193 Va. 522, 69 S.E.2d 342 (1952), the defendants assert that the easement has been abandoned based upon non-use by the plaintiff's predecessors in title coupled with adverse use by the owners of the servient estate, acquiesced in by the plaintiff's predecessors in title, who were the owners of the dominant estate. (Defendants' Mem. at 19.)

The law concerning abandonment of an easement is well-settled. "Mere non-use is not sufficient to establish an abandonment." *Helms v. Manspile*, 277 Va. 1, 10, 671 S.E.2d 127 (2009), citing *Hudson*, 261 Va. at 302. However, "[n]onuse of an easement coupled with acts which evidence an intent to abandon or which evidence adverse use by the owner of the servient estate, acquiesced in by the owner of the dominant estate, constitutes abandonment." *Id.*, quoting *Robertson v. Robertson*, 214 Va. 76, 81, 197 S.E.2d 183 (1973). "If the party asserting abandonment relies upon non-use of the easement coupled with an adverse use by the owner of the servient estate, that adverse use must continue for a period of time sufficient to establish a prescriptive right." *Hudson*, 261 Va. at 302.

The court finds that the defendants have proven by clear and convincing evidence that the easement has been abandoned. The court is of the opinion that the easement was not extinguished by unity of seisin on account of the fact that the deed from J. E. Washburn to S. L. Goodman referred to the ABCD plat. Nevertheless, the easement has been abandoned. The evidence is uncontradicted that no one other than the defendants and their predecessors in title has used the thirty-foot road for over forty years. Moreover, the defendants and numerous witnesses testified that the thirty-foot road has never gone across the creek, in spite of the depiction of the thirty-foot road on the ABCD plat. Indeed, exhibits 6 and 14, photographs which were introduced at the evidentiary hearing, corroborate that the thirty-foot road ends at the defendants' house and does not veer in a westerly direction towards the creek. These photographs show huge trees in the alleged path of the thirty-foot road and overgrown vegetation at the creek, all of which strongly suggests that, even if a road existed at that location many years ago, it has long since fallen into disuse. There is also no dispute in the evidence that, since 1939, the defendants and their predecessors in title have maintained gates across the thirty-foot

road in a manner that is adverse to the rights of the owners of the dominant estate and that the plaintiff's predecessors in title acquiesced in that adverse use.

*2. Have the defendants obtained title to a strip of land on the west side of the creek at the watering area through adverse possession?*

The law of adverse possession is equally well-settled. In *Grappo v. Blanks*, 241 Va. 58, 61-62, 400 S.E.2d 168, 170-71 (1991), the Supreme Court of Virginia stated as follows:

> To establish title to real property by adverse possession, a claimant must prove actual, hostile, exclusive, visible, and continuous possession, under a claim of right, for the statutory period of 15 years. A claimant has the burden of proving all the elements of adverse possession by clear and convincing evidence. . . .
>
> Use and occupation of property, evidenced by fencing the property, constitutes proof of *actual* possession. One is in *hostile* possession if his possession is under a claim of right and adverse to the right of the true owner. One's possession is *exclusive* when it is not in common with others. Possession is *visible* when it is so obvious that the true owner may be presumed to know about it. Possession is *continuous* only if it exists without interruption for the statutory period.

(Citations omitted; emphasis in original). In *Quatannens v. Tyrrell*, 268 Va. 360, 372, 601 S.E.2d 616 (2004), the Supreme Court of Virginia stated that, in order to support a finding of hostile possession,

> the possessor must profess, through words or actions, a belief that he is entitled to use the land and prevent others from using it in a manner that precludes the legal owner from exercising his rights over the property. If possession is hostile, the legal owner
> and the possessor cannot simultaneously exercise control over the land. *Thus, permission negates hostile possession.*

(Emphasis added.)

The defendants argue that, over fifty years ago, J. E. Washburn, the defendants' remote predecessor in title, "erected the first fence on the western bank of the creek," and that "[t]he Washburn family maintained that fence until Robinson erected the current fence sometime after March 18, 2004." (Defendants' Mem. at 21.) The defendants argue further that "the Washburns' use of the Watering Area to provide water to their horses and other animals has been open, adverse, hostile, continuous, with claim of right and all other elements to acquire the property west of the centerline of the Creek in the Watering Area either by adverse possession or as an easement by prescription." *Id.* Citing *Matthews v. W. T. Freeman Co.*, 191 Va. 385, 60 S.E.2d 909 (1950), the plaintiff counters that "all of the evidence from the Washburns indicate that their use of the property after the conveyance by their grandfather to S. L. Goodman was expressly with the permission of the actual owners. . ." and that "[a]t no time did they ever assert dominion and control over this property to the exclusion of anyone else nor [sic] put anyone on notice that they were making a claim of ownership to any portion of the property on the western bank of the Little Marrowbone Creek." (Plaintiff's Mem. at 14.) The court agrees with the plaintiff and finds that the defendants have failed to prove all of the elements of adverse possession by clear and convincing evidence. It is true that, for years, the defendants and their predecessors in title maintained fences around the floodplain area so that their horses could graze in the pasture. However, since the defendants' use of the floodplain area has always been with the permission of the current owner of that area, the defendants' possession has not been hostile and under claim of right. From 1966 until 1999, James A. Hopkins, who owned the pasture in question, permitted the defendants' horses to graze on his land. From 1999 to 2003, James F. Wheeler, Jr., who owned the pasture in question, allowed the defendants' horses to graze there. Warren Radford, whose limited liability company bought tracts A, B, C, and D in 2003, told Margaret that she could continue to let her horses graze in the pasture. Finally, Cynthia Robinson gave her permission for such use of the pasture to continue following the plaintiff's purchase of the property. In order for the horses to get to the pasture, they had to traverse the watering area and walk up the west bank of the creek. The land abutting the west side of the creek was, of course, a part of the pasture. Since the defendants' use of the pasture throughout the years was with permission, it necessarily follows that the defendants' use of the land on the west side of the creek, including the one hundred ten foot strip of land bordering the watering area, was also with permission.

The plaintiff asserts, and the defendants mostly agree, that the boundary line between their respective parcels is the centerline of the creek. In *Richmond v. Thompson*, 116 Va. 178, 184-85, 81 S.E. 105 (1914), the Supreme Court of Virginia stated that "[t]he general rule is that a conveyance of land bounded on a highway or private stream includes the soil to the center of the highway or the center of the stream, provided the grantor at the time owned to the center, and there are no words or specific description to show a contrary intent." *See also Talbot v. Mass. Life Ins. Co.*, 177 Va. 443, 14 S.E.2d 335 (1941). The deed conveying Tracts A, B, C, and D from J. E. Washburn and Josephine Washburn to S. L. Goodman contains a metes and bounds description with the following course and distance: "thence up Little Marrowbone Creek 1300 feet, more or less." The deed conveying Tract 39 from J. E. Washburn and Minnie Odell Washburn to M. A. Washburn and Margaret L. Washburn states that the boundary line runs "with said Creek as it meanders. . . ." Since there is no expression of a contrary intent in either deed, the court finds that the boundary line between the respective parcels of the parties is the centerline of the creek for a distance of 1300 feet, more or less.

With regard to the remaining issues in the case, the court finds that the plaintiff failed to prove damages arising from his inability to use the thirty-foot road and, therefore, grants the motion to strike Count V of the complaint. The court finds that the defendants failed to prove by clear and convincing evidence a mutual mistake of fact and, therefore, denies their claim for reformation. The court also finds that the defendants failed to prove an implied grant on the west side of the creek at the watering area. The court denies the defendants' request to require the plaintiff to water his animals at another location on the creek and will require the parties to share the watering area at its current location to the fullest extent possible in light of the court's ruling concerning the boundary line.

In summary, the court grants judgment in favor of the plaintiff with respect to Count I of the complaint. The court grants judgment in favor of the defendants with respect to Counts II, III, and IV of the complaint. The court grants the motion to strike with respect to Count V of the complaint.

The court grants judgment in favor of the defendants with respect to Count III of the second amended counterclaim. The court grants judgment in favor of the plaintiff with respect to Counts I, II, IV, and V of the second amended counterclaim.