Darrell H. MOORE and Wanda June Moore, his Wife; Lynda L. McAfee; David Ramsey and Linda L. Ramsey, His Wife, Appellants,

v.

Roy E. STILLS and Shirley Stills, his Wife; Cleveland Winstead; James Dement; Curtis Dement; Pat Vandiver; Emma Lou Yates; Margaret Sue Jones; George Flener; Jerry Flener, Appellees.

No. 2008–SC–000193–DG.

Supreme Court of Kentucky.

March 18, 2010.

As Corrected April 7, 2010.

Thomas E. Turner, Turner & Brantley, Madisonville, KY, Ross Thomas Turner, Louisville, KY, Counsel for Appellants.

Kevin Dane Shields, Dietz, Shields & Freeburger, Henderson, KY, Counsel for Appellees.

Opinion of the Court by Justice ABRAMSON.

In November 2002, the second generation descendants of I.E. Winstead—Cleveland Winstead, James Dement, Curtis Dement, Pat Vandiver, Emma Lou Yates, Margaret Sue Jones, George Flener, Jerry Flener, and Shirley Stills, together with Shirley's husband Roy E. Stills ("Petitioners")—petitioned the Hopkins Circuit Court to quiet their title to an area of wild, formerly strip-mined land adjacent to and east of the 239–acre farm they had acquired through their parents from their grandfather. Petitioners based their claim on adverse possession. A Hopkins County jury found in Petitioners' favor, but the Hopkins Circuit Court, by order entered February 28, 2006, granted a judgment notwithstanding the verdict ("JNOV") to the owners of record—Lynda L. McAfee; David M. and Linda L. Ramsey, husband and wife; and Darrel H. and Wanda June Moore, also husband and wife ("Respondents"). Petitioners appealed, and the Court of Appeals, by opinion rendered September 7, 2007, reversed the trial court's JNOV and reinstated the jury's verdict. This Court then granted Respondents' motion for discretionary review to consider whether Petitioners' use of the disputed land for recreational purposes was sufficient to establish their adverse possession of it, and in particular whether the Recreational Use Statute, KRS 411.190, precluded Petitioners' claim. We also agreed to consider whether Petitioners had sufficiently defined and marked the boundary of their claim for the purposes of adverse possession. Because we agree with Respondents that Petitioners' recreational use was not adequate to establish the adverse possession of another's land under either the common law or KRS 411.190(8) and that Petitioners failed to prove the "well-defined boundary" element of their claim, we reverse the opinion of the Court of Appeals and thereby reinstate the trial court's JNOV.

## RELEVANT FACTS

Although the parties vigorously dispute their legal consequences, the facts in this case are largely undisputed. The land at issue is situated about three miles south of Madisonville and lies between what was and apparently still is known as the I.E. Winstead Farm to the west, and what, until recently, was known as the Walter J. Ruby Blue Valley Farm to the east.[1] I.E. Winstead acquired his roughly 239–acre farm in 1936, and until his death in 1972 he farmed a portion of it; left some of it, including much of its eastern side, as wooded spoil land; and operated a small coal mine. The farm passed by deed and inheritance to the four children of I.E. Winstead's first marriage, and from them by deed and inheritance to the present Petitioners.

The Blue Valley Farm comprises several tracts totaling approximately 354 acres. A small acreage is in cultivation, but most of the farm remains unimproved, wooded spoil land. Respondents purchased the Blue Valley Farm from Walter Ruby in 1999, and in the course of having their new

---

**1.** One witness referred to it as the Blue Ridge Farm. "Blue Valley" however is the name that occurs more often in the record.

property surveyed, they discovered that between their farm and the Winstead Farm lay five relatively small tracts, three owned by Bank One, the successor to the Kentucky Bank and Trust Company of Madisonville, and two owned by the Ruby Construction Company of Smyrna, Georgia (no relation to Walter Ruby). In 2001 Respondents acquired those intervening five tracts, totaling about sixty-five acres, by quitclaim deeds.

In the meantime, Respondents and Petitioners had come into conflict over the boundary between their two holdings. In late 1999 or early 2000, Respondents had confronted a guest of Petitioners trespassing, they believed, on the western portion of the Blue Valley Farm, and again in 1999 Petitioners had sold timber from one or more of the intervening tracts to a lumber company, Snow Enterprises, LLC. Respondents' objection to that sale led both to Respondents' discovery and acquisition of the intervening tracts and to this action by Petitioners to quiet title to the disputed area between the two farms.

The disputed area comprises approximately 125 acres, the sixty-five intervening acres and another sixty acres from the westernmost tracts of the Blue Valley Farm. Although Petitioners claim, and sought to prove at trial, that they adversely possessed this entire 125–acre area, they unilaterally agreed to limit the Blue Valley Farm land actually awarded to them to the approximately twenty-five acres in line with the sixty-five acres of intervening tracts, making their total award in the judgment which the Court of Appeals reinstated approximately ninety acres.

While the actual eastern boundary of the Winstead Farm lies along the western edge of the intervening tracts and along the eastern edge of their easternmost cleared field, Petitioners offered testimony to the effect that their family had long—at least since the 1960s—believed that the Winstead Farm extended eastwardly to a meandering line beginning at a large boulder in the south, about thirty yards north of the Blue Valley Road, and running roughly northeast from there between two small lakes formed from strip mining pits to the intersection of three trails and then along a spoil ridgeline to the bed of an old coal mining rail spur at a point where there once stood a gum tree and where one of the old concrete railroad right-of-way markers bears the remnants of three barbwire fences. Petitioners introduced an aerial photograph of the area on which some of these landmarks are visible, they introduced photographs of the boulder, a video recording depicting the entire eastern line, and testimony by a surveyor to the effect that he had been shown some of the line and that landmarks such as those mentioned could be used to provide a metes and bounds description of the line.

Petitioners also introduced evidence that the purported eastern boundary line had been marked as such. Roy Stills, the husband of Shirley Stills, one of I.E. Winstead's granddaughters, testified that early in his marriage to Shirley, her father and grandfather had taken him hunting on the disputed tract and had pointed out to him the purported boundary line described above. Later, in about 1982, the surviving children and grandchildren of I.E. Winstead had informally made Stills the overseer of the farm, and beginning then, he testified, and continuing until about 2000, when the dispute arose with Respondents, he had regularly marked and remarked that eastern boundary by tying engineering tape to trees that grew along it and by posting "no trespassing" signs on some of the same trees. Several other friends and hunting acquaintances of Stills, and other Winstead family members, also testified that Stills had pointed out to them the boundary line and that they had observed

or even assisted in its flagging and posting.

In addition to his testimony concerning the location and marking of what Petitioners claimed was the Winstead Farm's eastern boundary, Stills testified that for as long as he had been connected with the Winstead family, from well before 1982, he and other family members had regularly used the disputed tract for hunting, fishing, hiking, and riding four-wheelers. He described the construction of deer and turkey blinds, the occasional clearing of undergrowth to facilitate shooting, and the expulsion of uninvited hunters from the property. Again, several other witnesses confirmed that Petitioners, a few of them at least and principally Stills and his guests, had regularly used the disputed land in that manner.

On the basis of that testimony and the other evidence summarized above, the jury found that Petitioners "held adverse possession of the real estate in question." The trial court, however, as noted, granted Respondents' motion for judgment notwithstanding the jury's verdict and by order entered February 28, 2006, dismissed Petitioners' suit. The court explained that in its judgment Petitioners had failed to prove with sufficient clarity that they had marked any boundary lines except the purported eastern one. It also noted that "[i]n any event, the mere marking of a boundary without reducing to actual possession the land in question will not amount to an adverse holding."

The Court of Appeals reversed. In its opinion, testimony by a couple of witnesses who had been occasional hunting guests to the effect that they had helped Stills flag and post the eastern boundary line and that the flagging had continued on the farm's other boundary lines as well, was sufficient to satisfy Petitioners' burden of proving that the disputed tract had well-defined north and south boundaries, in ad-

dition to the much-discussed eastern boundary. The trial court's concern that Petitioners had not reduced the disputed area to actual possession was addressed in the Court of Appeals' opinion in terms of KRS 411.190(8), which, in pertinent part, provides that the use of land "solely for recreational purposes," will not support a claim of adverse possession. Noting that this subsection of KRS 411.190 did not go into effect until July 15, 2002, well after Petitioners' claim had allegedly ripened, the Court of Appeals ruled that it did not apply retroactively to Petitioners' claim. Otherwise, the Court indicated that because Petitioners' use of the land was consistent with its character, that use sufficed to establish that Petitioners had reduced the disputed area to actual possession.

Respondents have now brought both of the trial court's concerns to this Court. They insist that the boundary-marking testimony relied upon by the Court of Appeals does not locate with sufficient definiteness the north and south boundaries of the land Petitioners claim. They also insist, again relying on KRS 411.190, that the trial court was correct when it implied that Petitioners' recreational use of the disputed property did not reduce it to actual possession. Convinced that the trial court was indeed correct with respect to Petitioners' recreational use of the property being insufficient to establish actual possession, we begin our discussion with that issue. We will then more briefly consider the boundary-line issue.

### ANALYSIS

**Adverse Possession Does Not Arise Unless The Claimant "Actually" Possesses The Disputed Property.**

I. **Sporadic, Insubstantial Use of Property Did Not Amount To "Actual" Possession at Common Law.**

 We review an order granting JNOV for clear error. "That is to say, we

must review all the evidence presented to the jury and must uphold the trial court's decision if after all the evidence is construed most favorably to the verdict winner, a finding in his favor would not be made by a reasonable [person]." *Moore v. Environmental Construction Corporation,* 147 S.W.3d 13, 16 (Ky.2004) (citation and internal quotation marks omitted). For the reasons discussed below, we agree with the trial court that the petitioners' evidence did not permit a reasonable finding of adverse possession, and thus we must uphold the trial court's JNOV.

■ The doctrine of adverse possession is an amalgam of statutory and common law. Under KRS 413.010, "an action for the recovery of real property may be brought only within fifteen (15) years after the right to institute it first accrued to the plaintiff, or to the person through whom he claims." This statutory limitations period incorporates what the common law has long deemed necessary for the right of recovery to accrue. Our predecessor Court described the elements that would start the running of the limitations period as follows:

> To start the running of the statute of limitations, the disseizor must have an actual possession; it must be an open, notorious, and visible possession; it must be a selfish or exclusive possession, that is the disseizor must hold possession for himself to the exclusion of the true owner, and all others; it must be a hostile possession, not only as against the true owner but as against the world; it must be a definite possession, that is its confines must be marked by an inclosure or other plainly visible indications; the disseizor must fly his flag, and indicate the lines of his dominion, the extent of his possession must be evident; and it must be a possession under a claim by the disseizor of ownership in himself, so

notorious as to amount to a constructive notice of its adverseness. When all these things coexist, the running of the statute starts. To keep it running the disseizor must in this commonwealth maintain that status in full vigor in all its elements for every hour of every day for 15 years....

*Flinn v. Blakeman,* 254 Ky. 416, 71 S.W.2d 961, 969 (1934) (citations omitted).

In *Young v. Pace,* 145 Ky. 405, 406, 140 S.W. 555 (1911), another case from early in the last century, our predecessor Court described the elements of an adverse possessory holding this way:

> In order to support a title by adverse holding, three facts must be established: First, the possession must have been continuous, actual, open, notorious and peaceable for at least fifteen years; second, the exterior boundary lines of the land so claimed must be well defined, i.e., either actually enclosed or so marked that the land is susceptible of being identified by its description; and third, the possession must have been of such a character and extent as to exclude the idea that the right to possession was in anyone else.

*Id.* at 406, 555, 140 S.W. 555. The third element is now usually subsumed by the requirement that the possession be "actual."

■ More recently, we identified "five elements, all of which must be satisfied, before adverse possession will bar record title: 1) possession must be hostile and under a claim of right, 2) it must be actual, 3) it must be exclusive, 4) it must be continuous, and 5) it must be open and notorious." *Appalachian Regional Healthcare, Inc. v. Royal Crown Bottling Company, Inc.,* 824 S.W.2d 878, 880 (Ky. 1992) (*citing Tartar v. Tucker,* 280 S.W.2d 150, 152 (Ky.1955)). These common law elements of adverse possession must all be

maintained for the statutory period of fifteen years, and it is the claimant's burden to prove them by clear and convincing evidence. *Commonwealth Department of Parks v. Stephens*, 407 S.W.2d 711 (Ky. 1966); *Flinn v. Blakeman, supra.*

■■■ As these citations indicate, our law has long provided that an adverse possession will not arise unless the claimant has reduced his claim to an "actual" possession, a possession, in other words, evidenced by such use and occupation of the claimed property as to establish a clear dominion over it. It is not enough, as our predecessor Court explained in *Flinn*, that one merely stretch one's boundary to include property beyond one's deed. One may not, while living on one's rightful property

"acquire title through such a stretching operation to other property about which he might mark a line. A disseizor to acquire title by adverse possession must have possession of the property he hopes to acquire. He is not in possession of it, if while he is living on another tract, he simply mentally extends his claim over it."

71 S.W.2d at 972. Accordingly, it has long been held that "[t]he surveying and marking of a boundary, the payment of taxes, and occasional entries for the purpose of cutting timber are not sufficient to constitute adverse possession." *Flinn, supra* at 972 (citing *Griffith Lumber Company v. Kirk*, 228 Ky. 310, 14 S.W.2d 1075 (1929)) (internal quotation marks omitted). *See also Fields v. Wells*, 224 Ky. 620, 622, 6 S.W.2d 1110, 1111 (1928). ("[A]ppellees could not by going beyond the boundaries of these surveys [their rightful holdings] and marking another boundary, however well they may have marked it, obtain title of the land to this marked line. A naked claim of ownership, however long persisted in, is not sufficient.") Regardless of how well Petitioners may have flagged and posted the eastern and other boundary lines of the disputed property, therefore, that marking did not commence the running of the limitations period unless and until it was accompanied by a use of the property clearly indicative of Petitioners' intent to exert dominion over it to the exclusion of the rightful owner.

■■■ Petitioners maintain that their long use of the disputed area for hunting and fishing and other recreational purposes as well as their 1999 sale of timber were sufficient acts of dominion to constitute "actual" possession for adverse possession purposes. We disagree. Our law is replete with cases holding that the removal of timber from wild lands is not sufficient to establish actual possession of the land. *See, e.g., Noland v. Wise*, 259 S.W.2d 46 (Ky.1953); *Marsee v. Colson*, 307 Ky. 328, 210 S.W.2d 952 (1948); and *Flinn, supra.* Similarly, our predecessor Court found such uses as the masting of hogs, the ranging of cattle, the conducting of a sugar camp; the operation of a water mill; the cutting of bushes and hay; the occasional sowing of grass, and the intermittent holding of church services and meetings insufficient to establish the actual possession of another's land. *Flinn, supra* at 972 (collecting cases); *Kentucky Women's Christian Temperance Union v. Thomas*, 412 S.W.2d 869 (Ky.1967) (cutting hay, digging pond, growing crop and similar activities insufficient); *Miller v. Cumberland Petroleum Co.*, 269 Ky. 525, 108 S.W.2d 514 (1937) (church's members hitching of horses, parking of automobiles and picnics insufficient). Many of our sister states are in accord as to the insufficiency of incidental uses. *Estate of Welliver v. Alberts*, 278 Ill.App.3d 1028, 215 Ill. Dec. 580, 663 N.E.2d 1094 (1996) (maintenance of hiking and motorcycle trails insufficient); *Nome 2000 v. Fagerstrom*, 799

P.2d 304 (Alaska 1990) (maintenance of trails); *Hardt v. Eskam,* 218 Neb. 81, 352 N.W.2d 583 (1984) (seasonal hunting and cattle grazing); *Pierz v. Gorski,* 88 Wis.2d 131, 276 N.W.2d 352 (Wis.App.1979) (establishing worm bed, spraying for poison ivy, planting clover and trees); *Rowland v. McLain,* 86 Ga.App. 140, 70 S.E.2d 918, 920 (1952) ("the roaming of cattle and hogs, the posting of signs forbidding trespassing, driving away hunters from time to time").

 The Virginia courts, whose early exposition of the common law provided the starting point for our own common law tradition, Ky. Const. § 233, have long held that "wild and uncultivated land cannot be made the subject of adverse possession while it remains completely in a state of nature; a change in its condition to some extent is essential." *Calhoun v. Woods,* 246 Va. 41, 431 S.E.2d 285, 287 (1993) (*citing Craig–Giles Iron Co. v. Wickline,* 126 Va. 223, 101 S.E. 225, 229 (1919)). This rule is consistent with our own requirement that adverse possession be evidenced by substantial activity on the land; sporadic uses, such as those indicated above, do not suffice. *Kentucky Women's Christian Temperance Union v. Thomas, supra; Phillips v. Akers,* 103 S.W.3d 705 (Ky.App.2002). The rule is also consistent with the presumption that the sporadic use of wild lands is permissive. *Bradley v. City of Harrodsburg,* 277 Ky. 254, 126 S.W.2d 141 (1939).

Petitioners' use of the disputed property for hunting, fishing, and other recreation and their one-time removal of timber are indistinguishable from these other uses which have been held not to establish "actual" possession. Their use has in no way altered the condition of the property. It remains today the wild, unimproved land it has long been. Indeed, with the possible exception of unusual circumstances not present here, the mere recreational use of property has as its aim the enjoyment of the land as it naturally is, and thus by its nature, recreational use will be sporadic and insubstantial. Under our law, such use has never sufficed to establish an adverse possession.

 Petitioners point out that the acts necessary to reduce property to actual possession will depend to some extent on the character of the property, its physical nature, and the use to which it has been put. *Appalachian Regional Healthcare, Inc.,* 824 S.W.2d at 880 (*citing Ely v. Fuson,* 297 Ky. 325, 180 S.W.2d 90 (1944)); *Culton v. Simpson,* 265 Ky. 343, 96 S.W.2d 856 (1936). As the discussion above makes clear, however, that does not mean that wild and uncultivated lands may be reduced to actual possession by any use whatsoever. The use must still be so substantial as to put the owner on notice that his or her dominion over the land is being usurped. Recreational uses, which do not alter the character of the land and so leave the owner's potential uses undisturbed, do not suffice. Otherwise, if merely posting the land and hiking or hunting on it were enough to establish adverse possession, the law would in effect be putting the trespasser on the same footing with the rightful owner of record. *Craig–Giles Iron Co. v. Wickline,* 126 Va. 223, 101 S.E. 225, 229 (1919). ("It is vain for him [the would-be adverse possessor] to say that he has had all the possession of which the property was then susceptible; for that would lead to a constructive possession, which is only attributable to the rightful owner.") As the cases we have discussed demonstrate, that was not the law in Kentucky even when settlement and development of the state's vast wild lands was a principal public concern. Even less so is it the law now, when conservation of wild lands has assumed an important place in

our land-use strategy. Brian Gardiner, "Squatters' Rights and Adverse Possession: A Search for Equitable Application of Property Laws," 8 Ind. Int'l & Comp. L.Rev. 119 (1997); John G. Sprankling, "An Environmental Critique of Adverse Possession," 79 Cornell L.Rev. 816 (1994). Mere recreational use, in sum, does not amount to "actual" possession for adverse possession purposes, and therefore such use does not set running the KRS 413.010 limitations period.

## II. KRS 411.190(8) Codifies And Clarifies Judicial Precedent To The Effect That Recreational Use Does Not Amount To "Actual" Possession.

■ This brings us to the Recreational Use Statute, KRS 411.190. While we have noted that Petitioners' recreational use of the property in question would not have sufficed as "actual" possession at common law, Respondents have argued for the same conclusion under the clear dictates of KRS 411.190(8). We agree that the Recreational Use Statute applies. Although the result in this case is the same under either common law or KRS 411.190(8), the Court of Appeals erred in concluding the statute did not apply.

As noted above, in 2002 the General Assembly enacted House Bill 387, which in pertinent part amended the Recreational Use Statute by adding the following provision: "No action for the recovery of real property, including establishment of prescriptive easement, right-of-way, or adverse possession, may be brought by any person whose claim is based on use solely for recreational purposes." KRS 411.190(8). The General Assembly defined "recreational purpose" in KRS 411.190(1)(c) as follows:

(1) As used in this section:

(c) "Recreational purpose" includes, but is not limited to, any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, bicycling, horseback riding, pleasure driving, nature study, water-skiing, winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites; and

■ Respondents maintain that this new provision precludes Petitioners' claim, which they did not bring until November 1, 2002, about three-and-a-half months after the new provision took effect. Petitioners counter, and the Court of Appeals agreed, that KRS 411.190(8) was not intended to apply retroactively to claims, such as Petitioners', which arose prior to the effective date of the new provision. We agree with Respondents, however, that KRS 411.190(8) does operate retroactively and thus should have been applied to Petitioners' claim.

■ As Petitioners and the Court of Appeals correctly observe, our Courts indulge a strong presumption, embodied in KRS 446.080, against the retroactive application of substantive changes to the law. In pertinent part, that statute provides that "[n]o statute shall be construed to be retroactive, unless expressly so declared." KRS 446.080(3). In *Commonwealth Department of Agriculture v. Vinson*, 30 S.W.3d 162 (Ky.2000), we explained that under this provision substantive amendments to the law, *i.e.*, "[a]mendments which change and redefine the out-of-court rights, obligations and duties of persons in their transactions with others . . . come within the rule that statutory amendments cannot be applied retroactively to events which occurred prior to the effective date of the amendment." *Id.* at 168. On the other hand, however, statutory amendments that do not affect substantive rights,

amendments often referred to as "remedial," "do not come within the rule prohibiting retroactive application." *Id.* at 169 (*citing Peabody Coal Co. v. Gossett*, 819 S.W.2d 33 (Ky.1991)).

 Among the "remedial" enactments are statutory amendments that clarify existing law or that codify judicial precedent. Because such amendments do not impair rights a party possessed when he or she acted or give past conduct or transactions new substantive legal consequences, they do not operate retroactively and thus do not come within the rule against retroactive legislation. *Blake v. Carbone*, 489 F.3d 88 (2nd Cir.2007); *National Mining Association v. Department of Labor*, 292 F.3d 849 (D.C.Cir.2002); *Western Security Bank, N.A. v. Superior Court*, 15 Cal.4th 232, 62 Cal.Rptr.2d 243, 933 P.2d 507 (1997).

As discussed above, judicial precedent in the Commonwealth has long provided that the mere incidental use of another's property will not give rise to an adverse possession. Although we have no case law saying so expressly, recreational use, such as that Petitioners have made of the disputed property in this case, is an incidental use of land and it is indistinguishable from other specific uses we have held to be incidental. Thus under preexisting common law Petitioners' claim would have failed. KRS 411.190(8) codifies a portion of this preexisting law and clarifies it by addressing recreational use expressly, but it does not alter the law in any substantive way. KRS 411.190(8), therefore, does not implicate the rule against retroactive legislation, and the Court of Appeals erred by failing to apply KRS 411.190(8) to this case.

KRS 411.190(8) applies, of course, only to adverse possession claims brought "solely" on the basis of recreational use. Petitioners hope to escape its application by noting that in addition to their recreational use of the property, their claim is based on their 1999 timber sale. Even if the timber sale, as a non-recreational use, lies outside the scope of the Recreational Use Statute, the statute would nonetheless apply to Petitioners' solely-recreational-use claim prior to 1999 and thus would leave them with a claim that falls far short of the requirement that the adverse possession continue for fifteen years. The timber sale, in sum, does not save Petitioners' claim under KRS 411.190(8) any more than it would have done under the common law. The trial court's JNOV correctly so held.

### III. Petitioners Failed To Prove A Well–Defined And Marked Boundary For The Entire Limitations Period.

 Respondents also contend that the Court of Appeals erred by deeming Petitioners' boundary-line proof sufficient. As noted above, proof, by clear and convincing evidence, of a well-defined boundary is an essential element of an adverse possession claim. The claimed land, our predecessor Court held nearly a century ago, must be "either actually enclosed or so marked that the land is susceptible of being identified by its description." *Young v. Pace*, 140 S.W. at 555. Whether this standard retains its vitality in an age when global positioning systems make precise boundary descriptions a relatively simple matter is an interesting question. Jeffrey Evans Stake, "The Uneasy Case For Adverse Possession," 89 Geo. L.J. 2419 (2001). It is a question best left to the General Assembly, however, and in any event having decided on other grounds that Petitioners' claim must be dismissed as a matter of law, we need not address it here.

Even under the old standard, we agree with the trial court that Petitioners' boundary-line proof was insufficient. As noted at the outset of our analysis, we will uphold an order granting JNOV "if after all the evidence is construed most favorably to the verdict winner, a finding in his favor would not be made by a reasonable [person]." *Moore v. Environmental Construction Corporation,* 147 S.W.3d 13, 16 (Ky.2004) (citation and internal quotation marks omitted).

In this case, as the trial court noted in its order granting judgment NOV, Petitioners' proof was directed exclusively to establishing the location of their purported eastern boundary line and the fact that that line had been continuously marked and posted since about 1982. The western boundary of the disputed area, moreover, coincided with the eastern boundary of the Winstead Farm, and that line, although not proven by Petitioners, was introduced by Respondents. Petitioners have not referred us, however, to any testimony purporting to locate the northern and southern boundaries of the disputed area. They rely instead on a couple of their exhibits, which did purport to show the northern and southern lines. During his testimony, Roy Stills drew an outline of the disputed area on a large aerial photograph of the two farms, including northern and southern boundaries. Petitioners also introduced a smaller aerial photograph of the area on which the quitclaimed intervening tracts were marked in conjunction with the rest of the disputed area. That exhibit, too, indicated northern and southern boundaries. On both exhibits the southern boundary appears to extend in a straight line from the southeastern corner of the Winstead Farm to the large stone at the southeastern corner of the disputed area. The exhibits thus render that boundary susceptible to an identifying description. The northern boundaries pictured on the

two exhibits do not coincide, however. On the Stills exhibit, the northern boundary appears to run in a straight line from the northeast corner of the Winstead Farm to the gum tree/right-of-way marker at the northeast corner of the disputed area. On the other exhibit, however, the northern boundary is shown as following the old rail bed a bit north of the Stills line. Without clarifying testimony, therefore, and we have been referred to none, these exhibits are ambiguous and do not permit an identifying description of the northern boundary. Were Petitioners attempting to claim to that boundary, the trial court's determination that their proof was insufficient would clearly be correct.

As noted at the outset, however, this case is unusual in that Petitioners have reduced the land they hope to be awarded to an area inside the area they claim to have adversely possessed. Their tendered judgment includes a full metes and bounds description of this smaller area, and it appears that the northern boundary of that area is within both of the boundaries pictured on the trial exhibits. In these circumstances it may be wondered whether an accurate description of the outer boundary is necessary or whether instead proof that the outer boundary was clearly marked for the entire limitations period should suffice.

Even assuming that proof of marking would suffice, however, we are not convinced that the trial court clearly erred when it ruled that Petitioners' proof came up short. Although, as the Court of Appeals noted, a couple of Stills's hunting acquaintances commented during their testimony that they had during a few of the years in question helped Stills flag and post not only the eastern boundary but "the entire farm," no rational juror could deem that scant testimony clear and convincing evidence that the northern and

southern boundaries had been clearly marked for the entire limitations period. We have not been referred to any other evidence tending to establish that the northern and southern boundaries were continuously marked for fifteen years, and thus, on this ground too, the trial court's JNOV was proper.

## CONCLUSION

In sum, Kentucky law has long rejected adverse possession claims based on the sporadic or insubstantial use of another's property. With KRS 411.190(8), the General Assembly has codified a portion of that law by expressly providing that adverse possession is not established by recreational use alone. Because that statute clarifies existing law but does not alter it, its application to this case was not barred by the rule against retroactive legislation, and under the statute Petitioners' claim fails as a matter of law. Their claim also fails as a matter of fact, inasmuch as they did not meet their burden of proving that the entire boundary of their claim was clearly defined and marked throughout the fifteen-year limitations period. For these reasons the trial court did not err when it granted Respondents' motion for judgment NOV. Accordingly, we reverse the September 7, 2007 Opinion of the Court of Appeals and hereby reinstate the February 28, 2006 Judgment of the Hopkins Circuit Court.

MINTON, C.J.; CUNNINGHAM, NOBLE, and SCHRODER, JJ., concur.

SCOTT, J., dissents by separate opinion in which VENTERS, J., joins.

SCOTT, Justice, dissenting opinion.

I must respectfully dissent, as this is not a case of just giving "notice" via "recreational trespasses." This is a case about flagging the *entire* boundary line of the claimed property with brightly-colored engineering flagging and "No Trespassing" signs which gave notice to *anyone* near, or, or about the property that it was the "private property" of the Appellees, who had continuously put up the flags and signs—not that of Appellants—who claimed most of the "disputed property" under quitclaim deeds their counsel drafted *after* the dispute began—and these deeds purported to recognize *that it was* Appellants' Grantor, Walter Ruby, that had adversely possessed the "disputed property."

### I. *Background*

This "Quiet Title" action was instituted by Appellees in the Hopkins Circuit Court on November 1, 2002, after Appellants questioned Appellees' ownership following Appellant's initial purchase of the adjoining "Ruby Farm" in 1999. The question of adverse possession was tried before a jury in October of 2005, whereupon the jury entered a verdict finding that Appellees had adversely possessed that portion of the "disputed property" for which they requested their titled be quieted.[2] [3] How-

---

**2.** Although Appellees' proof substantiated title by adverse possession to a larger boundary (out to "the green line"), Appellees requested their title be quieted only to that portion of the "disputed property" to which the Appellants' asserted title under two quitclaim deeds from the Kentucky Bank and Trust Company and the Ruby Construction Company (purporting to recognize that Walter Ruby, Appellants' grantor, had adversely possessed it), plus a smaller adjacent portion to the north.

These quitclaim deeds from Kentucky Bank and Ruby Construction were prepared by Appellants' counsel.

This lesser claim was consistent with Appellees' Affidavit of Adverse Possession filed of record in the Hopkins County Court Clerk's office on June 11, 2002, and at trial, which affidavit contained, as an attachment, an engineering map plotting tracts I–V as acquired by Appellants under the aforementioned quitclaim deeds and also including a small tract,

VI, encompassed by extending the eastern line of tract V northerly to an intersection point with the northern line of tract IV.

The Kentucky Bank quitclaim deed to Appellants, noted above, was executed in January 2001 for *"no consideration,* but in order to acknowledge that Grantor [, Kentucky Bank,] does not repudiate any of the claim of Grantees [, Appellants,] that title to the hereinafter described property ripened in Walter J. Ruby prior to his death on February 1, 2000, by virtue of his *adverse possession* of said property, the Grantor by this instrument does hereby grant, alien and convey *by way of quitclaim* unto the Grantees...."* (Emphasis added). The Kentucky Bank deed was filed of record in the Hopkins County Court Clerk's office on January 29, 2001.

The Ruby Construction quitclaim deed to Appellants, noted above, was executed in April 2001 and also filed of record in the Hopkins County Court Clerk's office on May 2, 2001. It contained the same language: that it was for *"no consideration,* but in order to acknowledge that Grantor does not repudiate the claim of Grantees [, Appellants,] that title to the hereinafter described property ripened *in* Walter J. Ruby prior to his death on February 1, 2000 by virtue of his *adverse possession* of said property, the Grantor by this instrument does hereby grant, alien and convey, *by way of quitclaim* unto the Grantees...."* (Emphasis added).

Appellees' plat of the quitclaim tracts, along with the small tract VI, Appellees' Exhibit 3, was prepared by Ronald Johnson & Associates, P.S.C., consulting engineers, and land surveyors on April 2, 2002. Each of the five tracts (tracts I–V) granted by quitclaim from Kentucky Bank and Ruby Construction are described in the deed by survey descriptions, including the northern line of tract IV, which when squared to a point of intersection with the eastern line of tract V, establishes the complete northern and eastern boundaries of tract VI, since each of these side lines are straight lines coming from tracts IV and V. To the extent the lesser boundary that Appellants sought at trial falls within the greater boundary they proved they had actually claimed ("open and notoriously") on the disputed tract, as shown by the evidence. Its location may be established with certainty based upon the survey description of the tracts contained in these deeds.

Moreover, to the extent any of the lines of the "lesser claimed boundary" on the eastern side fell outside the boundaries of the larger "disputed area", such portions would be outside of any area claimed by the Appellees in their complaint and would be limited by the eastern line (the "green line"), and thus could not be owned or later pursued by Appellees, pursuant to the doctrine of "splitting causes of action". *See Capital Holding Corp. v. Bailey,* 873 S.W.2d 187, 193 (Ky.1994) ("The rule against splitting causes of action ... is an equitable rule, limiting causes of action arising out on a single 'transaction' to a single procedure").

As noted, Appellees' Affidavit of Adverse Possession with the attached plot of tracts I–VI (Exhibits) was filed of record in the Hopkins County Court Clerk's office on June 11, 2002. Suit followed November 1, 2002. Appellants initially purchased the "Walter Ruby farm" from Walter J. Ruby, Jr. by deed dated October 21, 1999 and lodged of record in the Hopkins County Court Clerk's office on October 21, 1999 in Deed Book 583 at page 516. Their quitclaim deeds to the disputed property—recognizing title by adverse possession in their Grantor (Ruby)—were dated January and April 2001.

3. The jury found for the Appellees under the following instructions:

> Instruction I. You will find for petitioners if you are satisfied from the evidence that Petitioners, either personally or through their agent, Roy Stills, held adverse possession of the real estate in question at the time of the end of peaceable possession. Otherwise, you will find of the Respondents.
>
> Instruction II. The term "adverse possession" as used in Instruction I above means that the Petitioners continuously for a period of fifteen years or more prior to November 1999 or April 2000, whichever date the jury may believe that peaceable possession ended, had been in actual, open, notorious and adverse possession of the land in controversy, claiming the land to a well-defined or well-marked boundary sufficient to put the true owners of the land, assuming each of them to be an owner of ordinary prudence and diligence in looking after his estate, upon notice that the Petitioners were claiming the land as a matter of right and as their own. If the Petitioners['] possession is under a mistaken belief that one's deed includes land, it is adverse if the possessor (Petitioners) does not concede that there may be a mistake

ever, months later, the trial court entered a Judgment Notwithstanding the Verdict (JNOV) in favor of Appellants. The Court of Appeals then reversed in favor of Appellees and we granted discretionary review.

## II. *Analysis*

### A. Standard of Review of a JNOV

"A motion for JNOV shall not be granted unless 'there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ.'" *Bierman v. Klapheke*, 967 S.W.2d 16, 18–19 (Ky.1998). "Upon review of the Order Granting JNOV, we must examine the trial court's decision under the clearly erroneous standard. That is to say, we must review all the evidence presented to the jury and must uphold the trial court's decision if '*after all the evidence is construed most favorably to the verdict winner, a finding in his favor would not he made by a reasonable [person].*'" *Moore v. Environmental Const. Corp.*, 147 S.W.3d 13, 16 (Ky.2004) (emphasis added) (internal citations omitted).

### B. The Elements of Adverse Possession

"The 'open and notorious' element [of adverse possession] requires that the possessor openly evince a purpose to hold dominion over the property with such hostility that will give the non-possessory owner notice of the adverse claim." *Appalachian Regional Healthcare, Inc. v. Royal Crown Bottling Co., Inc.*, 824 S.W.2d 878, 880 (Ky.1992) (*citing Sweeten v. Sartin*, 256 S.W.2d 524, 526 (Ky.1953)). "To be 'open and notorious' the possession must be conspicuous and not secret, so that the legal title holder has notice of the adverse use." *Id.* (*citing Sweeten*, 256 S.W.2d at 526). Thus, "[i]t is the legal owner's knowledge, either actual or imputable, of another's possession of lands that affects the ownership." *Id.* (*citing* Am. Jur.2d *Adverse Possession*, § 71 (1986)). Moreover, "the character of the property, its physical nature and the use to which it has been put, *determine* the character of the acts necessary to put the true owner on notice of the hostile claim." *Id.* (*citing Ely v. Fuson*, 297 Ky. 325, 180 S.W.2d 90 (1944)).

And, in *Le Moyne v. Litton*, 159 Ky. 652, 167 S.W. 912 (1914), the question was presented as to what "established a well-marked or a well-defined boundary." *Id.* at 913. The tract in question involved a portion of land in Whitley County which had been cleared and cultivated and upon which was erected a house, with the remainder of the tract left as woodlands, "which the Defendant ha[d] used in a general way as farmers ordinarily use such lands." *Id.* The respondent contended that "the proof for Defendant failed to establish a well-marked or well-defined boundary." *Id.* "It was shown by evidence that, when the survey was made, all the corners called for in the certificate of the Cordell survey were still standing and marked; and that there were marked line trees on all the lines except one, which [passed] through cleared ground." *Id.* at 913–14. Upholding the marking of the line by "marked trees,"[4] the Court noted that "[t]he purpose of marked lines is to give notice to the world that the possession and claim of the occupant is co-extensive there-

and if they show an intention to hold the land in all events.

4. A "marked tree" is a tree which has been marked in some way, generally by a slash or mark made by an axe or a hatchet. Once made, the mark remains and grows with the tree even though its fresh color will disappear with time.

with. If the lines are sufficiently marked, that purpose is served." *Id.*

Also, in *Le Moyne v. Neal*, 168 Ky. 292, 181 S.W. 1119 (1916), our predecessor Court noted:

> When D.B. Neal gave the land to his son, the appellee, he went upon it with him and showed to him the boundary of it and the marked line which surrounded it, and appellee has claimed to be the owner of it ever since, to the boundary showed him by his father; that the corner trees to the boundary of the land, with the exception of one, which has been cut down and the stump of its remains, were all marked in the ordinary way as corner trees are marked to land boundaries; that the corner tree which has been cut down, when standing, was marked in the same way; that all of the lines surrounding the lands are marked upon the trees along the lines sufficiently to enable one to follow the line around the tract and to locate the boundary by the markings upon the trees, by which the lines pass. All of the markings upon the trees appear to be very old, and were there before Gilreath entered upon the land, and was the same marked line to which D.B. Neal had claimed for many years.

*Id.* at 1121. Upon such evidence, the Court concluded:

> It is apparent that the evidence going to uphold the contention that the land is surrounded by a well-marked and well-defined boundary is sufficient to take the case to the jury, and, there being no evidence to the contrary, the verdict of the jury, if it found that there was a well defined and marked boundary, was not contrary to the evidence and was sufficient to support the verdict.

*Id.* For context, it is appropriate to note that the appellee in *Neal* also cut trees on the property, as did Appellees here. *Id.* at 1120. It has also been said:

> It is difficult to lay down a precise rule applicable to all cases, as much must depend upon the nature and situation of the property, and the uses to which it can be applied. For example, in the case of a farm, if the possession is open and notorious, comporting with the ordinary management of farms, it is not necessary that the whole farm be either improved or inclosed [sic], at least where the unimproved part, as woodland, is subservient to and connected with that which is improved, and, for the same reason, the rule requiring actual and visible occupancy will be more strictly construed in an old and populous country, where land is usually improved and inclosed [sic], than in a new country recently settled, in which the land is only partially improved.

*Culton v. Simpson*, 265 Ky. 343, 96 S.W.2d 856, 860 (1936) ("The size of this property is not disproportionate to its use as a farm. It was not all cleared, and perhaps not all inclosed [sic], but fifty years ago that was true of many farms in Kentucky.").

It was also noted in *Gillis v. Curd*, 117 F.2d 705 (6th Cir.1941), that:

> According to the settled doctrine of the above statutes as declared by the Court of Appeals of Kentucky, when applied to lands in a community where fences are not customary, a person, by entering upon a part of a tract or parcel of uninclosed [sic] land in the name of the whole, may gain title to all of it by adverse possession. When such person settles within a large body of wild, uncultivated, unenclosed [sic], vacant land, his title by adverse possession, and those claiming under him, ripens to the following boundaries: (1) to buildings, clearings or inclosed [sic] lands where maintained for the statutory period, (2)

to boundaries kept marked for such period and in such way as to give to the owner of the land ... notice that it was a marked boundary and that some person was claiming to be in hostile possession of the land therein, (3) by putting to record in the County Clerk's office of the County where the land is located for the statutory period, a deed describing its boundaries by natural or artificial objects so that it can be run by a surveyor, although the boundary described in the deed need not be sufficient to constitute a well-marked boundary without the deed.

*Id.* at 708; *see also Feldman Lumber Company v. Meece,* 2006–CA–001812–MR, 2006–CA–001841–MR, 2007 WL 2332585 at *2 (Ky.App.2007) ("For nearly 30 years, Defendants have marked the outside boundary with 'No Hunting' signs thereby giving open and notorious notice of their claim.") (*reversed on other grounds by Meece v. Feldman Lumber Company,* 290 S.W.3d 631 (Ky.2009)).

Quite pointedly, the Court in *Panter v. Miller,* 698 S.W.2d 634, 636 (Tenn.Ct.App. 1985), observed that:

One does not ordinarily fence in inaccessible mountain land to show ownership. It is ordinarily done by marking or painting trees and putting up signs. This is exactly what the defendant did. The land was not susceptible to farming. *About the only other thing the defendant could have done to make his possessory claim any clearer to the public at large would have been to hire armed guards to shoot anyone who set foot on the land.*

(Emphasis added). The Court in *Beam v. Kerlee,* 120 N.C.App. 203, 461 S.E.2d 911, 919 (1995), also explained:

When questioned about other people's use of the land, defendant testified that he put up no trespassing signs in 1991 and asked hunters he found on the property to leave. Defendant said he had been running people off the land long before he posted the property—"for twenty plus years." This evidence was sufficient to support defendant's claim that his possession of the land was exclusive and adverse as to all others.

## C. The Cases Relied Upon By the Majority

For a contrary opinion, the majority relies upon *Noland v. Wise,* 259 S.W.2d 46 (Ky.1953), *Marsee v. Colson,* 307 Ky. 328, 210 S.W.2d 952 (1948), *Flinn v. Blakeman,* 254 Ky. 416, 71 S.W.2d 961 (1934), *Griffith Lumber Company v. Kirk,* 228 Ky. 310, 14 S.W.2d 1075 (1929), *Fields v. Wells,* 224 Ky. 620, 6 S.W.2d 1110 (1928), as well as *Craig–Giles Iron Co. v. Wickline,* 126 Va. 223, 101 S.E. 225 (1919). *Flinn* involved an attempt to acquire a 2500–acre tract lying in Knox County by adverse possession. There, the court noted:

While there is no satisfactory evidence that Campbell Smith had a well-marked boundary around this entire 2,500 acres, still he could not while living on the "Reservation" acquire title through such a stretching operation to other property about which he might mark a line. A disseizor to acquire title by adverse possession must have possession of the property he hopes to acquire. He is not in possession of it, if while he is living on another tract, he simply mentally extends his claim over it. He must be there with his flags flying and his possession openly and visibly manifested.

71 S.W.2d at 972. Moreover, in *Flinn,* the Court acknowledged that "[a]dverse possession cannot be sustained by proximity or intention. It can only rest on physical acts, such as will give to the real owner of the land notice that some other person is in possession of it." *Id.* (*quoting Whitley County Land Co. v. Powers' Heirs,* 146

Ky. 801, 144 S.W. 2, 7 (1912)). Thus, seasonal, or sporadic acts, such as "the masting of hogs thereon, or the ranging of cattle, or the conducting of a sugar camp, will not constitute such adverse possession within the meaning of the law." *Id.* (*quoting Courtney et al. v. Ashcraft et al.,* 31 Ky.L.Rep. 1324, 105 S.W. 106 (1907)). Of course, hogs only mast when the "mast" (acorns, walnuts, beech nuts, etc.) is on the ground in the woods, i.e., fall. Cattle only "range" through the woods looking for water or grass that grows in cleared areas. And, one only makes sugar from sugar maples in the spring. Cane for "cane sugar" grows in cleared fields.

In *Noland,* the court noted that:

Neither appellees nor their predecessors in title have ever occupied the land in controversy. It is rough, mountainous land, with no clearings, buildings, or enclosures, although there is some evidence of an old fence along a part of one of the boundary lines.

The only act of possession ever exercised by appellees or their vendors was the occasional cutting of timber.

259 S.W.2d at 48. The Court further noted that: "[t]his Court has consistently held that the *occasional* cutting of timber and payment of taxes do not constitute an adverse holding sufficient to acquire title by adverse possession, even though such acts continued *sporadically* for the prescriptive period." *Id.* (emphasis added). *Marsee* held only that "[e]ntries upon unenclosed land to cut timber do not constitute an adverse holding, even though the acts continue sporadically for the prescriptive period." 210 S.W.2d at 953. *Griffith Lumber Co.* noted that:

[T]he only acts of possession consisted of cutting some timber, and the extent of it is not definitely described. The land in question was a wooded boundary with no one living upon it. A tract of probably 40 acres had been cleared, but no one had lived there, and the proof was wholly inadequate to establish adverse possession of any particular land.

14 S.W.2d at 1076. *Fields* held that, "[s]o long as their acts denoting adverse possession were confined to the boundaries of the surveys, title of which they owned, their possession was likewise so confined." 6 S.W.2d at 1111. *Craig–Giles Iron Co.* had nothing to do with the flagging and marking of lines with "No Trespassing" signs. 101 S.E. at 225.

## D. The Evidence of the Marked Lines

"Marked lines" made on a survey differ from the marking of the disputed boundary in this case. Trees marked in the old surveys occurred only at the end location of each call—the corner tree. Here, Mr. Stills testified:

My system was to put your flags within sight of each other where you could stand at one flag and you could see a flag in one direction, you could turn your back and you could see a flag in the other direction. And I say about every third or fourth tree, you put a posted [No Trespassing] sign.

Quite pointedly, none of the cases relied upon by the majority involve the use of the disputed property along with its marking around the boundaries with bright engineering tape and "No Trespassing" signs, as well as the "putting off" of the property those who came on without Appellees' permission. Clearly, the continuous marking of the lines in this case totally differs from the boundaries marked in the late–1800s through the early–1900s, where one made a "slash" mark on trees with an axe around a survey or a boundary and then never came back to make sure the marking remained fresh and visible. Here, the brightly colored engineering tape flagging and "No Trespassing" signs were continu-

ally redone as they would deteriorate (or were later torn down), thus maintaining a visible line which continually indicated that Appellees were there claiming, and exercising dominion—indeed, essentially flying their flag—over, the disputed boundary.

Moreover, the majority concedes that the disputed property is "an area of wild, formerly strip-mined land adjacent to and east of the 239–acre farm [Appellees] acquired through their parents from their grandfather." Op. at 74. Being spoil (strip-mined) land, you could not plow it with a team of mules! Moreover, the topography was uneven as demonstrated by Stills' testimony that the bank going down to the "Blue Lake—which lay within the perimeter of the disputed tract—was steep. Numerous hills, rock piles, and ridges were disclosed on the video played at trial.

The majority also acknowledges that Roy Stills, a Winstead family member and manager of the family's Winstead farm, testified

> that for as long as he had been connected with the Winstead family, from well before 1982, he and other family members had regularly used the disputed tract for hunting, fishing, hiking, and riding four-wheelers. He described the construction of deer and turkey blinds, the occasional clearing of undergrowth to facilitate shooting, and the expulsion of uninvited hunters from the property. Again, several other witnesses confirmed that petitioners, a few of them at least and principally Stills and his guests, had regularly used the disputed land in that manner.

Op. at 76. In fact, Stills testified that he used the land year-round and that, from time to time, the family even kept a boat on the "Blue Lake." Additionally, Stills and his family "logged" one hundred thirty-four trees off of the disputed property in 1999. This was the same year Appellants (apparently unrelated to Walter Ruby) bought their original interest in the adjoining "Ruby" farm. Their later "quit-claim" deeds—purporting to recognize Ruby's title to the "disputed property" by adverse possession—came two years *into* the dispute and years after the statutory period had ran.

Evidence of the marking and defining of the boundary lines was presented at trial via the testimony of Mr. Stills, Robert Chillcut, David Humpres, Dennis Hart, Roy Eugene Stills, Dunham Box, Norris Slaton (an adjoining owner), and Jerry Flener. The boundary lines were continuously flagged with the bright engineering tape and "No Trespassing" signs during the adverse possession period. As mentioned, the flags tied around the trees were done with brightly-colored engineering tape. Mr. Stills noted that as the "flags ... would deteriorate, they would have to be replaced, but they were on there from 1982 up until ... late–1999 or early–2000." This was about the time of the timbering (and Appellants' initial purchase) and "from then on they had been disappearing."[5] Mr. Chillcut testified he saw the flags. Mr. Hart testified, "[t]he boundary lines were marked continuously and we also re-flagged them as needed." He also helped put up the "No Trespassing" signs. As to where the flagging and signs were posted, he testified they were placed "[o]n all the boundary lines. We

---

5. Roy Stills testified that the first controversy with Appellants—and thus, the end of peaceful possession—was in April 2000, six months after the timber was cut. Appellants, on the other hand, allege that the first controversy was a discussion between Roy Still and one of Appellants in November 1999 after timber was cut on the disputed tract. Appellants acquired their initial interest in the "Ruby Farm" in 1999.

didn't do just one side, we did the whole farm." Roy Eugene Stills testified, "[a]nd I had walked it over and helped him flag the whole farm." Mr. Box also testified he helped put up signs and that they were "[o]n all the boundary lines. We didn't just do one side, we did the whole farm."

In addition, Frank Williams, a licensed surveyor, testified that Mr. Stills' way of marking lines with flags and signs is a general way of signaling boundary lines and not uncommon in the area. In fact, he stated that "I mark my lines the same way." When asked if it was a well-defined boundary and could you write a legal description from it, he testified, "yes."

Thus, in this instance, it is inappropriate to dismiss Appellee's actions as "mere recreational use," when, in fact, their use was open—it was posted and flagged, and thus, notorious; it was continuous from 1982—no one testified otherwise; it was exclusive—all persons found upon the property without permission were "put off" the property. And given the signage and flagging, as well as exclusive claim to, and use of, the disputed property, it was obviously "hostile". *See Appalachian Regional Healthcare*, 824 S.W.2d at 878. Even by the time of the timbering in October of 1999, the required fifteen-year time period had elapsed.

In fact, that Appellees actually believed that their claim extended all the way out to the eastern line was supported by the deed for the Winstead farm is an inescapable conclusion. This was not a line established for the purposes of adverse possession; it was a line recognized by the family. Moreover, all the evidence introduced is consistent with the recognition of this same eastern boundary line by Appellees' predecessor in title, Walter Ruby. There is no evidence in the record that Mr. Ruby ever objected to, or insisted upon, a differing line from the 1960s all the way up to the time when Appellants bought their initial interest in the "Ruby Farm" in October of 1999 (well after the limitations period) and started trying to survey the boundary lines. The only question remaining is the claim to a *well-defined boundary*.

### E. The Well–Defined Boundary

As aforementioned, in reviewing a JNOV, "we must review all the evidence presented to the jury and must uphold the trial court's decision if after all the evidence is construed *most favorably to the verdict winner*, a finding in his favor would not be made by a reasonable [person]." *Moore*, 147 S.W.3d 13, 16 (Ky.2004) (emphasis added) (internal citation and punctuation omitted). In this regard, the majority concedes that the eastern dividing line of the disputed tract ("the green line") between the Winstead heirs' farm and the Ruby farm, as well as the western line, was established sufficiently by the proof. They conclude, however, that proof of the much shorter "northern" and "southern" boundary lines was insufficient, and with regard to the various witnesses that testified otherwise, they assert "no rationale juror could deem that *scant* testimony clear and convincing evidence that the northern and southern boundaries have been clearly marked for the entire limitations period." Op. at 82–83 (emphasis added).

In support of this statement, they also assert that "[w]e have not been *referred* to any other evidence tending to establish that the northern and southern boundaries were continuously marked for fifteen years, and thus, on this ground too, the trial court's JNOV was proper." *Id.*

However, at trial, with a marker pen, Mr. Stills drew the boundary of the "disputed property" on an overlay over an *enlarged aerial photograph* of the area,

which was then filed as Exhibit 1, 2. In regards to this line, as he was drawing it, he testified:

> This road right here is Pennyrile Parkway, this is the early bypass, and here is Blue Valley Road coming up through here. Our property line starts on the farm basically right here [southern end of *west* line and beginning corner of *south* line]. Blue Valley Road comes around, and this [as he marks] is on the western boundary, western side of the I.E. Winstead Farm. Blue Valley Road comes right up through here, back up through here, round over through here, there is a big boulder right in here about thirty [30] yards off of Blue Valley Road [the ending corner of the *south* line, to which he drew a straight line from the beginning corner, the southern end of the *western* line] [,] and we have claimed this boulder [the end corner of the *south* line]; pretty well there is a ridge comes all the way down through down here, right down through here, comes up between the two lakes here . . . starts right inside here, the thirty [30] yards off the curve [indicating the boulders, the end call of the *southern* line and the beginning call of the *eastern* line ("the green line")]; comes into a ridge right down through here, comes in between these two lakes. . . .
>
> . . . . I figure our property line [now drawing and discussing the *eastern* line] [,] what we have always been told by ancestors, the property line comes right up between those two lakes, comes up on the ridge, right in through here. There is an old barbwire fence line right in through here. You just follow that barbwire fence line, comes down right down through here, here's the three-way intersection right through here and up through here [three-way trails intersection]. Barbwire fence line comes down through here and we turn and our prop-erty line [continued *east* line] will cut across and cut back over through here . . . [there's an] old ridge over through here . . . there's a gas line right in here, PVC pipes are here, there's an old railroad bed through here, go on this other side of this railroad bed and there's a, there was an old gum tree that had three big stumps growing out of it, [it was] considered the property line [the northern end of the eastern side]. It's been rotted out, you can see where it's at; if you can't, the tree's not there anymore. The old railroad bed has got concrete right-of-way markers on it and we used a concrete right-of-way marker out there that has got a lot of fence in it [where the gum tree stump was]. The barbwire is all rotting off, but you can see the barbwire comes out three different directions from this way, *then that way, coming that way* [the *northern* line back to the north end of the *west* line]. We were always told that I.E. Winstead property was right here [as he completes the north line], the Norris Slaton property was right there [his northern neighbor], and [the] Walter Ruby property was up through here.

Even Norris Slaton supported the northern corner of the eastern line at the "gum tree stump" by the old concrete right-of-way marker. Interestingly enough, Norris Slaton was the adjoining owner on the north side of the disputed property. According to him, the deed for his farm *referenced* the gum tree stump as an intersection *between* the Winstead farm, the Ruby farm, and his property—the same one claimed to by Appellees and testified to by Mr. Stills.

Mr. Stills was later asked by counsel, "[f]or purposes of your adverse possession claim, what boundary line have you been adversely possessing to or claiming as your own under a mistaken belief?" He

again replied, "[a] cross the boundary line that we've got marked on the map over there [referring to plaintiffs exhibits 1 and 2] that our ancestors have shown what we own." These lines enclose the "disputed property" on the enlarged aerial photo on all sides (north, west, south, and east).

Jerry Flener also testified and was asked, and answered, as follows:

Counsel: Earlier, I had Roy draw what he calls a boundary line pointed out by his ancestors, are you familiar with that line?

Flener: Yes I am.

Counsel: Do you believe that line is in the place that Roy drew?

Flener: I firmly believe, after my dad and my granddaddy told me that that is the line that the property actually lays on. I have no other reason not to believe that it didn't.

In reference to Appellees' evidence to a well-defined and marked boundary, a portion of which I have recited, this Court said in *Neal* that:

All of the markings upon the trees appear to be very old, and were there before Gilreath entered upon the land, and was the same marked line to which D.B. Neal had claimed for many years. It is apparent that the evidence going to uphold the contention that the land is surrounded by a well-marked and well-defined boundary is sufficient to take the case to the jury, and, there being no evidence to the contrary, the verdict of the jury, if it found that there was a well defined and marked boundary, was not contrary to the evidence and was sufficient to support the verdict.

181 S.W. at 1121. Thus, plainly, a claim to a well-defined and well-marked line does not require a claim to a "survey" line; albeit, the descriptions contained in Appellants' two quitclaim deeds for tracts I–V, did provide survey descriptions by which the smaller boundary sought by Appellants and lying within the larger disputed tract (to which the Appellees claimed in their complaint and upon which they wanted and received a jury verdict) can be surveyed on the ground. In fact, these survey description tracts were plotted by engineers and introduced as Plaintiffs'/Appellees' exhibits 3 and 6. This also includes tract VI, which is formed by an extension of the northern line of tract IV and the eastern side of tract V.[6]

In reviewing a trial court's grant of a JNOV, "we must review all the evidence presented to the jury [and can only] uphold the trial court's decision if 'after all the evidence is construed most favorably to the verdict winner, a finding in his favor would not be made by a reasonable [person].'" *First and Farmers Bank of Somerset v. Henderson*, 763 S.W.2d 137 (Ky. App.1988).

Using this standard, this Court should not reverse the Court of Appeals. Thus, I also dissent to the majority's conclusion that the jury verdict was unsupported by evidence of a well-defined and well-marked boundary to which the Appellees claimed.

## F. The Recreational Use Statute, KRS 411.190(8)

KRS 411.190(8) provides that, "[n]o action for the recovery of real property, including establishment of prescriptive easement, right-of-way, or adverse possession, may be brought by any person whose claim is based on use solely for recreational purposes." KRS 411.190(2) establishes

---

**6.** In fact, the judgment tendered by Appellees prior to the JNOV included a full metes and bounds description of this area.

that "[t]he purpose of this section is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes." "Recreational purposes" is defined to include, but not limited to "any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, bicycling, horseback riding, pleasure driving, nature study, water-skiing, winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites[.]" KRS § 411.190(1)(c).

Quite clearly, no evidence was introduced by Appellants tending to establish, in any way, that the "disputed area" was ever set aside for any period of time "to the public for recreational purposes." KRS 411.190(1). Moreover, the act of going upon and marking a boundary with brightly-colored engineering flags and "No Trespassing" signs, as well as the act of evicting trespassers therefrom, is not "recreational" activity, nor is timbering. *See* KRS 411.190(1)(c).

That aside, the majority asserts that KRS 411.190(8), effective July 15, 2002—*five years after* the adverse possession statute ran in this case—may apply retroactively to Appellees' November 1, 2002 complaint for reasons that "statutory amendments that do not affect substantive rights, amendments often referred to as 'remedial,' 'do not come within the rule prohibiting retroactive application.'" Op. at 80–81 (*citing Commonwealth Department of Agriculture v. Vinson*, 30 S.W.3d 162, 169 (Ky.2000)). To this assertion, I must disagree.

Such a holding is simply hard to understand in view of this Court's recent holding in *Rodgers v. Commonwealth*, 285 S.W.3d 740, 751 (Ky.2009), where this Court reiterated:

Substantive amendments are those "which change and redefine the out-of-court rights, obligations and duties of persons in their transactions with others." *Commonwealth of Kentucky Department of Agriculture v. Vinson*, 30 S.W.3d 162, 168 (Ky.2000). By contrast, procedural amendments—"[t]hose amendments which apply to the in-court procedures and remedies which are used in handling pending litigation" *id.* at 168–69—are to be retroactively applied (assuming no separation-of-powers concerns) so that the proceedings "shall conform, so far as practicable, to the laws in force at the time of such proceedings." ... This is consistent with our approach to substantive, procedural, and remedial civil statutes under KRS 446.080. That statute provides in part that "[t]here shall be no difference in the construction of civil, penal and criminal statutes" and that "[n]o statute shall be construed to be retroactive, unless expressly so declared." Pursuant to these provisions, we have held, substantive civil statutes are not to be applied retroactively unless the General Assembly expressly declares otherwise, while procedural and remedial statutes are to be so applied. *Commonwealth of Kentucky Department of Agriculture [v. Vinson], supra; Peabody Coal Co. v. Gossett*, 819 S.W.2d 33 (Ky.1991).

Moreover, in *Rodgers,* we also cited to *University of Louisville v. O'Bannon*, 770 S.W.2d 215, 217 (Ky.1989) for the proposition that, "[w]hether a particular circumstance constitutes a cause of action [or conversely a defense] ... is a matter of substantive law." *Rodgers,* 285 S.W.3d at 751.

Thus, given this Court's *recent* position on these matters, I cannot accept that the *taking away* of a right of action to quiet one's title is "procedural" or "remedial"

and thus I must also dissent as to this issue.

### III. *Conclusion*

Therefore, for the reasons stated, I dissent.

VENTERS, J., joins this dissent.